814 So.2d 322 (2002)
Julio MORA, Appellant,
v.
STATE of Florida, Appellee.
No. SC94421.
Supreme Court of Florida.
January 24, 2002.
Rehearing Denied March 28, 2002.
*323 Gene Reibman, Fort Lauderdale, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Marrett W. Hanna, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal judgments of conviction of first-degree murder and attendant death sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the convictions but vacate the sentences and remand for a new penalty phase.

*324 BACKGROUND
A Broward County grand jury returned a three-count indictment charging Dr. Julio Mora with the first-degree murder of Dr. Clarence L. Rudolph, the first-degree murder of attorney Karen Starr Marx, and the attempted first-degree murder of attorney Maurice Hall. A jury convicted Mora on all counts as indicted.
On May 27, 1994, Mora was the plaintiff in a sexual harassment suit against his former employer, the American Association of Retired Persons (AARP), and its agent, Rudolph. Rudolph was the project director for a division of the AARP. Mora acted as his own attorney, Hall represented Rudolph, and Marx represented AARP. Also present was court reporter Patricia Charelton, who subsequently changed her last name to Grant. The deposition was held at Coastal Reporting court reporting agency located on the sixth floor of the Cumberland Building in Broward County.
Prior to the deposition, Hall arranged the seating in the deposition room so that Rudolph and Mora were physically separated as much as possible. When Mora arrived, Mora objected to the seating arrangement; however, Hall did not allow for rearrangement. The deposition began at approximately 10 a.m.
Because those being deposed spoke with foreign accents, Grant used a tape recorder as well as her stenography machine. Approximately thirty minutes into the deposition, Mora announced that he had one more question. Grant testified that this announcement surprised her, so she looked up. She saw Mora standing with a gun in his hand. The tape of the deposition reveals that Grant said, "No, no, no, Dr. Mora, no." Grant testified that she saw Mora shoot Rudolph one time, then Hall one time, and then Marx one time. Then Mora began shooting them again. Grant then ran out of the room. She turned and saw Mora lean over the table and shoot Marx again.
Hall testified that he ran out of the conference room after being shot and hid. In fact, a bullet struck the door frame as Hall left the room. At some point soon thereafter, Mora left the conference room in pursuit of Hall. Hall then wrestled the jammed handgun away from Mora, and Brett Tannenbaum, owner of Coastal Reporting, restrained Mora until the police arrived.
The tape Grant used reveals that ten shots were fired in a span of forty-eight seconds. Shots one through nine occurred in the first seventeen seconds, with the last shot being fired thirty-one seconds later. After the initial barrage of shots, the tape reveals that Marx cried out, "Help me, help me, help me," prior to the last shot. Paramedics took an unconscious Marx to Broward General Medical Center, where she died on the operating table approximately two hours after being shot.
Dr. Nelson, the medical examiner, testified that Marx received four gunshot wounds, one of which went through her pregnant uterus.[1] Nelson testified that Rudolph had four gunshot wounds, including one to the back of the head. One of the bullets may have caused two of the wounds. Hall testified that he received two gunshot wounds, one to his abdomen and one to his shoulder.
Mora testified in his own defense. He described a conspiracy against him masterminded by Rudolph. Mora testified that his apartment was repeatedly being "gassed" with toxic gas at night by Rudolph and his associates and that he had taken several pills that morning. Mora described an incident where Rudolph's "associate," *325 an individual by the name of Wong Chung, shot out Mora's tire the day before the shootings. In fact, law enforcement individuals found a shredded tire in Mora's trunk; however, there was no evidence that the tire had been shot. Mora testified that his actions were in self-defense because during the deposition, a masked gunman, whom Mora would later believe to be Wong Chung, opened the conference door and pointed a pistol equipped with a silencer at him. Mora testified that Hall threw a briefcase at his head, that Rudolph dove for the floor to grab Mora's gun, and that Marx turned to grab her purse as if she were attempting to pull a gun. Mora testified at that moment he recollected a memory from 1936 of watching two brown-shirted Nazi soldiers kill two emaciated Jewish boys.
Prior to trial, the trial court conducted a competency hearing, after which the trial court found Mora competent. Jury selection began on April 7, 1997, with the trial beginning on April 10. There was disagreement between Mora and guilt phase counsel Dennis Colleran over trial strategy. Mora wanted to primarily pursue a self-defense theory. Colleran wanted to pursue an insanity defense. Mora finally consented to an insanity defense. Witnesses for Mora described how for years Mora lived in an abnormal wayMora constantly was filing police reports alleging that people were attempting to kill him, especially through gassings.
The jury began deliberating the morning of April 30, 1997, and returned its verdict that evening. The jury found Mora guilty on all counts. The trial court conducted a penalty hearing on Tuesday, May 27, 1997. Mora represented himself during the penalty hearing, as the trial court had previously allowed Mora to discharge his penalty phase counsel, Kenneth Malnik. The State introduced additional portions of the court reporter's tape but called no witnesses. Mora refused to present any evidence or argument. The jury recommended death on both counts of murder, each by a vote of eight to four. The trial court appointed Malnik as special court counsel to develop mitigation evidence. The trial court conducted a Spencer[2] hearing on July 9 and 10, 1997, at which hearing Malnik presented mitigation evidence.
On October 20, 1998, the trial court entertained further argument regarding Mora's competency, again finding Mora competent. The next day, the trial court sentenced Mora to death on both murder counts and sentenced him to a consecutive sentence of life in prison for the attempted murder charge. The trial court found that the previous violent felony aggravator applied to both murders on the basis of Mora's contemporaneous convictions and that the heinous, atrocious, or cruel aggravator (HAC) applied to the Marx murder. The trial court found seven nonstatutory mitigators[3] and rejected five statutory mitigators[4] and one nonstatutory mitigator.[5]
*326 Mora, through his appellate counsel, raises nine issues for our consideration.[6] We authorized Mora to file a pro se brief.[7] In that pro se brief, Mora raises three general issues.[8] We also requested supplemental briefing on one issue.[9]

GUILT PHASE ISSUES

Mora's Competency
The trial court conducted an extensive competency hearing on March 20, 1997, and accepted testimony from Dr. Patsy Ceros Livingston, Dr. Trudy Block Garfield, Dr. John Spencer, and Dr. Thomas Macaluso.[10] Dr. Ceros-Livingston testified that Mora suffered from paranoid schizophrenia and was not competent to stand trial. She testified that Mora had a delusional belief system which influenced how Mora viewed events. Dr. Block-Garfield also indicated that Mora was very manipulative, but she concluded that he was competent. Dr. Spencer testified that Mora met all of the competency criteria and therefore was competent to proceed to trial.[11] Dr. Spencer also indicated that *327 Mora had the ability to appreciate humor. Dr. Macaluso indicated that while Mora satisfied many of the competency factors, Mora was not competent because he could not testify relevantly or disclose relevant facts to his attorneys.
Mora argues that the trial court abused its discretion in finding him competent by relying on the testimony of Drs. Block-Garfield and Spencer. Mora points out that he has a delusional belief system such that any rational person would conclude from the record that Mora was not competent. Mora further argues that the trial court abused its discretion in finding Mora competent before the penalty phase proceeding and sentencing.[12] The State maintains that the trial court simply resolved conflicting testimony among the experts and by doing so did not abuse its discretion.
As we said in Hardy v. State, 716 So.2d 761, 763-64 (Fla.1998):
In determining whether a defendant is competent to stand trial, the trial court must decide whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); see also § 916.12(1), Fla. Stat. (1993); Fla. R.Crim. P. 3.211(a)(1). In situations where there is conflicting expert testimony regarding the defendant's competency, it is the trial court's responsibility to consider all the evidence relevant to competency and resolve the factual dispute. Hunter v. State, 660 So.2d 244, 247 (Fla.1995), cert. denied, 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996); Watts v. State, 593 So.2d 198, 202 (Fla.1992). The trial court's competency decision will be upheld absent a showing of an abuse of discretion. Hunter, 660 So.2d at 247; Watts, 593 So.2d at 202.
The trial court entered an extensive six-page order finding Mora competent. In its written order, the trial court examined each factor enumerated in rule 3.211(a)(2). The trial court observed that all of the experts generally agreed that Mora met three of the five factors for competency as enumerated in the rule. As to the two factors in disagreement, the trial court wrote:
The Court heard conflicting evidence regarding Defendant's ability to disclose pertinent facts to counsel, and to testify relevantly. Dr. Garfield testified that during examination, Defendant had no difficulty whatsoever in relating facts relevant to his case, including his desires, needs and goals regarding his case. Additionally, Dr. Spencer testified that Defendant's discussion of various topics in chronologically correct detail showed that Defendant thus had the capability to relate the details and pertinent facts of his own case in a similarly organized fashion.
Dr. Livingston, however, testified that if Defendant was delusional, his ability to relay facts relevant to his case may be hindered. Dr. Macaluso additionally testified that Defendant's refusal to accept the advice of counsel and proceed under an insanity defense was evidence that the Defendant could not relate or communicate rationally with his attorney, and was thus incompetent.
*328 State v. Mora, No. 94-008906-CF10A (Fla. 17th Cir. Ct., order at 3-4, March 25, 1997).
While the experts disagreed with the ultimate conclusion concerning Mora's competency, the trial court resolved those conflicts in favor of finding Mora competent. As we find evidentiary support in the record supporting the trial court's finding, we find that the trial court's finding was not unreasonable and that the trial court did not abuse its discretion. Thus, we do not disturb the trial court's determination that Mora was competent to stand trial.

Mora as Co-counsel and Mora Addressing the Jury
Mora's next argument on appeal consists of two subclaims. The first subclaim is that the trial court erred by granting Mora co-counsel status, and the second subclaim is that the trial court further erred by allowing Mora to address the jury during closing.
With regard to the first subclaim, Mora argues that there is no constitutional right to hybrid representation and that Mora did not make an unequivocal request to be his own attorney. Therefore, according to Mora, the trial court abused its discretion by offering to Mora the ability to become co-counsel even though there was significant testimony that Mora had a mental disorder.
We agree with Mora that there is no constitutional right for hybrid representation at trial. See McKaskle v. Wiggins, 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); State v. Tait, 387 So.2d 338, 340 (Fla.1980). But where a trial court allows a defendant to act as co-counsel, such decision is reviewed under an abuse of discretion standard. See Bell v. State, 699 So.2d 674, 677 (Fla.1997).
In the instant case, Mora previously had indicated his general disapproval of his counsel's strategy and counsel's conduct of the trial but had never made a clear and unequivocal request to represent himself.[13] The trial court granted Mora co-counsel status after Mora made a clear request to become co-counsel. The trial court granted the request near the conclusion of the trial and after Mora testified. While the trial court did not conduct a contemporaneous Faretta[14] inquiry, the trial court had on several previous occasions found that Mora satisfied the elements of Faretta. Cf. Bell, 699 So.2d at 677 (indicating that Faretta inquiry is not required in trial court's decision of whether to appoint defendant as co-counsel). Under these circumstances, we find that the trial court did not abuse its discretion in allowing Mora to become co-counsel. See id.
Similarly, Mora argues in the second subclaim that the trial court erred in allowing Mora to address the jury during closing arguments after his counsel had addressed the jury. We likewise find no merit in the second subclaim. A trial court's decision whether to allow a defendant who is represented by counsel to address the jury is subject to the abuse of *329 discretion standard. See State v. Tait, 387 So.2d 338, 340 (Fla.1980). Even when the defendant acts as co-counsel, the trial court's decision as to whether the defendant may address the jury is reviewed under an abuse of discretion standard. Cf. Davis v. State, 586 So.2d 1038, 1041 (Fla. 1991), vacated on other grounds, 505 U.S. 1216, 112 S.Ct. 3021, 120 L.Ed.2d 893 (1992).
Here, the trial court engaged Mora in an extensive colloquy before allowing him to give a closing statement. During that colloquy, the trial court asked Mora what issues he was going to talk about, limited Mora to new issues not raised by Dennis Colleran, and suggested to Mora again not to give a closing statement. Mora stated that his attorney had advised him not to give a closing argument. In this situation, we find that the trial court did not abuse its discretion in allowing Mora to give a brief closing statement.

Involuntary Intoxication
Mora argues that he was entitled to an involuntary intoxication jury instruction and cites to a line of cases from the Fourth District recognizing an involuntary intoxication defense. See Devers-Lopez v. State, 710 So.2d 720 (Fla. 4th DCA 1998); Carter v. State, 710 So.2d 110 (Fla. 4th DCA 1998); Brancaccio v. State, 698 So.2d 597 (Fla. 4th DCA 1997); Boswell v. State, 610 So.2d 670 (Fla. 4th DCA 1992). Mora argues that the gassing he received at the behest of Rudolph and the pills he took form the evidentiary predicate for the instruction. Mora, as trial co-counsel, specifically requested an involuntary intoxication instruction during the jury charge conference. While Mora did not reduce his request to writing, the trial court specifically ruled that involuntary intoxication did not exist. Therefore, Mora argues that any written submission would have resulted in the same ruling, so that a written request was not needed to preserve this issue.
The State argues that Mora failed to preserve this issue by not submitting a proposed instruction in writing. Alternatively, the State argues that Mora was not entitled to such an instruction because there was no evidence in the record linking the gassing received early in the morning to his actions later in the day. The State also points out that Mora's knowledge of repeated gassings prevents a conclusion that Mora's consumption of the alleged gas was involuntary. In any event, the State argues the trial court's failure to so instruct the jury was harmless.
Mora testified that Rudolph had gassed Mora in Mora's apartment the night before the shooting as Rudolph had done on previous nights. Unlike previous nights, the gas used by Rudolph that night was different. Mora testified that this new gas was chlorofluorocarbon, more commonly known as Freon 12, a refrigerant. He testified that the gas caused him to pass out but that the gassing ceased about 2:30 a.m. At 3:30 a.m., Mora went to the bathroom, vomited, and took a cold shower. At 4 to 4:30 a.m., Mora dressed. He also testified that Rudolph called him several times on the phone and threatened him.
Mora also testified that at some unspecified time in the morning he took several drugs.[15] Mora testified that he took Percodan, Darvocet, and Tylenol 3 for pain. He took two muscle relaxants, Inderal and Flexeril. Mora also claims to have taken Xanax for depression. There is no evidence in the record that these drugs were *330 prescribed for Mora, that he took the correct prescribed dosages, or that he was allowed to mix these prescriptions. Mora further testified that he called a taxi at 9 a.m. to drive him to the sheriffs department[16] and then to the deposition because he was "like a zombie" that morning because he "was totally drugged."
We agree with the State that Mora was not entitled to an involuntary intoxication instruction. In so deciding, we do not need to reach the issue of whether the defense of involuntary intoxication exists in Florida. But see Devers-Lopez, 710 So.2d at 721; Carter, 710 So.2d at 113; Brancaccio, 698 So.2d at 600; Boswell, 610 So.2d at 673. Assuming, without deciding, that the defense of involuntary intoxication does exist in Florida, we find that under the circumstances, Mora was not entitled to such a jury instruction.
Florida law is clear that a defendant is entitled to have a jury instruction on any valid defense supported by the evidence. See State v. Weller, 590 So.2d 923, 927-28 (Fla.1991). The jury and not the trial judge determines whether the evidence supports the defendant's contention. See id. However, a trial judge is not required to give an instruction where there is no nexus between the evidence in the record and the requested instruction. See Gardner v. State, 480 So.2d 91, 92-93 (Fla.1985) (finding no error in refusal to give voluntary intoxication instruction where no evidence that defendant was intoxicated at time of offense or the amount of alcohol consumed prior to offense); Linehan v. State, 476 So.2d 1262, 1264 (Fla. 1985) (noting evidence of alcohol consumption by itself insufficient to support giving voluntary intoxication instruction); Jacobs v. State, 396 So.2d 1113, 1115 (Fla.1981) (finding no voluntary intoxication instruction warranted when there was no evidence in record of amount of alcohol consumed or that defendant was intoxicated).
The record of this case reveals an absence of evidence which would indicate that Mora was intoxicated at the time of the shootings. In fact, those who observed Mora that morning indicated that he was able to successfully conduct himself and that he was not acting abnormally. The taxi driver testified that Mora was "a perfect gentleman," was not nervous, and engaged him in a conversation. Ana Benitez, a community service aide stationed at the sheriffs office, testified that Mora came in early that morning and asked for the location of the records department and the bathroom. Hall testified that Mora had an "appropriate demeanor" during the deposition and, although Mora was not skilled as a lawyer, Mora's performance was consistent with that of other pro se litigants Hall had seen. Grant testified that Mora was able to conduct the deposition, and it was not out of the norm of depositions. The court reporter's tape reveals that Mora was able to articulate responsive deposition questions. The first officer on the scene, Officer Hoelbrandt, testified that the Mora was calm and that Mora told him to "be fair."
In the instant case, there is no evidence suggesting that Mora was under the influence of any gases or drugs at the time of the shootings. As there was no evidentiary nexus, Mora was not entitled to an involuntary intoxication instruction. Cf. Gardner v. State, 480 So.2d at 92-93; Linehan, 476 So.2d at 1264; Jacobs, 396 So.2d at 1115.

Competent, Substantial Evidence
Mora in his pro se brief makes a passing notation that he did not commit any crimes. We view this allegation as an *331 argument that competent, substantial evidence does not exist in the record to sustain the convictions. Even if Mora had not raised this issue, we would have still reviewed the record under our independent duty to ensure the sufficiency of the evidence. See, e.g., Ferguson v. State, 417 So.2d 639, 642 (Fla.1982). In this case, there is competent, substantial evidence to sustain the convictions. Two eyewitnesses testified that Mora shot Rudolph, Marx, and Hall. Further, Grant's tape indicates that she yelled "no, no, no, Dr. Mora, no" just as the gun shots began. Mora himself testified that he fired the pistol, although in self-defense. The trial judge instructed the jury on self-defense, which the jury rejected.
Accordingly, we affirm the two first-degree murder and the attempted murder convictions.

PENALTY PHASE
Attorney Kenneth Malnik served as Mora's penalty phase counsel with Mora serving as co-counsel. On Friday, May 23, 1997, four days before the penalty phase was to begin, the trial court conducted a penalty phase jury charge conference. During that hearing, a significant disagreement arose between Malnik, Mora, and the trial court over Malnik's investigation of certain potential mitigating evidence. Specifically, Malnik wanted to contact Mora's siblings in Spain to see if any mitigation could be developed through them. Mora specifically prohibited Malnik from doing so because Mora was afraid that his siblings would not be able to handle learning of their brother's first-degree murder conviction because his siblings were quite elderly and weak. Mora continually stated that he wanted Malnik to continue to represent him, but he felt compelled to protect his family.
The trial court, applying our decision in Koon v. Dugger, 619 So.2d 246 (Fla.1993), refused to allow Mora to waive any possible mitigation without first allowing Malnik to develop all possible mitigation. The trial court thus construed Koon as a prohibition against waiving any possible mitigation without an on-the-record waiver of each possible mitigating factor after a full investigation of that mitigation by counsel. As a result of this construction, the trial court placed Mora in a quandary: either Mora would have to allow Malnik to contact Mora's relatives, or Mora would have to discharge Malnik with the knowledge that the trial court would not appoint successor counsel.
The trial court, Malnik, and Mora engaged in an extensive colloquy over this issue, but Mora initially did not ask to discharge counsel. In fact, Mora in many instances said he needed counsel's assistance. The trial court construed Mora's repeated statement that he wanted to protect his family as a request to represent himself. A Hardwick hearing was conducted, and the trial court found no reasonable cause to believe that Malnik was providing ineffective assistance. The trial court further advised that it was not required to appoint successor counsel and thereafter discharged Malnik, as Mora continually stated that he needed to protect his family.[17] Malnik was simultaneously appointed as Mora's standby counsel.
The penalty phase occurred on Tuesday, May 27. During this hearing, the trial court revoked Mora's ability to represent himself, finding Mora unable to do so, and *332 reappointed Malnik as penalty phase counsel. The trial court instructed Malnik to contact Mora's siblings in Spain. Mora vociferously refused to allow Malnik to contact these relatives and chastised Malnik that Malnik could not take direction from the trial court on how to prepare the case. The trial court thereafter discharged Malnik again. At this point, Mora refused to participate further in the penalty phase. While Mora and Malnik both had witnesses available at the penalty phase to testify to potential mitigation, Mora refused to call any witnesses or give a closing argument.
Mora argues that the penalty phase was not reliable because of the confusion over Mora's continually changing status as co-counsel, then counsel, then represented defendant, and finally counsel. Mora contends that the trial court committed reversible error for its failure to conduct a Faretta inquiry, even though the trial court had just a few moments previously found Mora incapable of serving as counsel, and that Mora's judgment and not the trial court's should have controlled with regard to whether certain mitigation would be presented. For these reasons, Mora contends that the death sentences should be vacated.
In response, the State argues that the trial court previously had undertaken numerous Faretta inquiries and had made the requisite findings. The trial court repeatedly warned Mora of the dangers of self-representation and strongly urged Mora not to discharge his counsel. The State also argues that the trial court correctly applied our decisions in Hardwick and Koon and that no reversal is required. While we are concerned about the lack of a contemporaneous Faretta inquiry, we do not need to decide whether there was a Faretta violation in this instance because we reverse the death sentences on the basis of Koon.
We agree that the sentences in this case should be reversed because we conclude that the trial court misapplied our decision in Koon. In Koon, the defendant wished to waive all possible mitigation and had instructed his trial counsel not to present any penalty phase evidence or testimony. See Koon, 619 So.2d at 249. Penalty phase counsel was not ineffective under the circumstances of that case because penalty phase counsel had conducted an investigation and argued mitigating evidence garnered during the trial phase. See id. at 250. To address the situation where a defendant refuses to present mitigating evidence, we adopted a four-prong test for a trial court to allow a waiver of mitigating evidence:
When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.
Id. at 250.
We do not agree with the trial court's application of our opinion in Koon, which, under the facts of this case, resulted in Koon becoming a prohibition against waiving any possible mitigation without counsel's full investigation of all possible mitigation. We have emphasized that we established the Koon procedure so that the record would adequately reflect a defendant's *333 knowing waiver of his or her right to present mitigating evidence. See Chandler v. State, 702 So.2d 186, 199 (Fla.1997); Allen v. State, 662 So.2d 323, 328-29 (Fla. 1995); see also Waterhouse v. State, 792 So.2d 1176 (Fla.2001) (noting result of Koon decision was for clear record of waiver of presentation of mitigating factors). In Chandler, we said:
[O]ur primary reason for requiring this procedure was to ensure that a defendant understood the importance of presenting mitigating testimony, discussed these issues with counsel, and confirmed in open court that he or she wished to waive presentation of mitigating evidence. Only then could the trial court, and this Court, be assured that the defendant knowingly, intelligently, and voluntarily waived this substantial and important right to show the jury why the death penalty should not be imposed in his or her particular case.
702 So.2d at 199.
The record in this case is abundantly clear that Mora desired to waive only a portion of possible mitigating evidence. Mora, who at the time of trial was in his seventies and his siblings in their seventies and eighties, informed the trial court of the reasons why he did not want to contact his siblings and indicated that there was no mitigation to be had. We conclude Mora was not requesting a waiver of other mitigating evidence Malnik thought appropriate. Mora was adequately advised of his ability to present the mitigating evidence from his family members, and his decision not to have Malnik disturb these relatives under the circumstances of this case should have been respected. Mora should not have been placed in the untenable position of either having that investigation or not having counsel.
We find that the trial court's application of our opinion in Koon was erroneous, and therefore we reverse for a new penalty phase. In the new penalty phase, the trial court is to apply our decisions in Koon, Farr v. State, 656 So.2d 448 (Fla.1995), and Muhammad v. State, 782 So.2d 343 (Fla.2001).

CONCLUSION[18]
Accordingly, we affirm the convictions, vacate the sentences, and remand to the trial court for a new penalty phase in proceedings consistent with this opinion. The trial court shall appoint Mora counsel for the new penalty phase. Of course, Mora may discharge such counsel only if he is competent and after the trial court conducts a proper Faretta inquiry and makes the requisite findings. If Mora's competency is again challenged, the trial court shall conduct appropriate proceedings under Florida Rules of Criminal Procedure 3.210, 3.211, and 3.212.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., concurs in result only.
NOTES
[1] Marx was in her first trimester of pregnancy.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The trial court found that Mora: (1) was under a delusional impression that people were trying to hurt himsome weight; (2) was a good employeesome weight; (3) had a difficult childhoodvery little weight; (4) had long-standing emotional problemslittle weight; (5) had a history of mental illness in his familylittle weight; (6) possessed good characteristicslittle weight; and (7) made significant contributions to societysome weight.
[4] The trial court rejected the statutory mitigators: (1) Mora's extreme mental or emotional disturbance; (2) Mora's capacity to appreciate the criminality of conduct or conform conduct to requirements of law; (3) Mora's age; (4) the victims' participation in Mora's conduct; and (5) that Mora had no significant criminal history.
[5] The trial court rejected Mora's claim that he acted with legal or moral justification.
[6] Appellate counsel argues that the trial court erred by: (1) finding the HAC aggravator applied to Marx's death; (2) rejecting the statutory mitigator of extreme emotional or mental distress; (3) rejecting the statutory mitigator of capacity to appreciate the criminality of his conduct or ability to conform his conduct to the law; (4) not finding Mora's lack of significant prior criminal history as a statutory mitigator; (5) rejecting Mora's age as a mitigator; (6) finding Mora competent to stand trial and be sentenced; (7) allowing Mora to be the guilt phase co-counsel and allowing him to address the jury; and (8) allowing Mora to discharge his penalty-phase attorney. Appellate counsel also argues that (9) cumulative error requires reversal of the death sentence and that the death sentence is not proportionate.
[7] We authorized Mora to file a pro se brief by order dated January 31, 2000. This authorization came before we issued our opinion in Davis v. State, 789 So.2d 978, 979-80 (Fla. 2001), in which we held that "we will not accept pro se filings in which there are claims of ineffective assistance of appellate counsel, requests to dismiss appellate counsel, or which supplement bases for relief from appellants on direct appeal of a death sentence." We address Mora's pro se brief in this opinion because we authorized Mora to file it prior to announcing Davis. We do not depart from our holding in Davis.
[8] Mora's pro se arguments can be grouped into three general categories: (1) the State is withholding his legal files preventing him from fully briefing his issues; (2) there is no competent, substantial evidence in the record to sustain his convictions; and (3) Mora's appellate counsel is ineffective. We deny issues one and three without prejudice to allow Mora to pursue these claims in a postconviction proceeding if such an event becomes necessary.
[9] After oral argument in this case, we requested briefing with regard to Mora's purported request for an involuntary intoxication instruction during the jury charge conference.
[10] Florida Rule of Criminal Procedure 3.210(b) provides that at least two but no more than three experts will be appointed by the court to examine the defendant. Apparently, the trial court appointed Dr. Block Garfield because of the uncertainty as to whether Dr. Spencer would be able to participate due to personal reasons. As Dr. Spencer was available, the trial court took testimony from all four experts.
[11] Dr. Spencer performed a competency evaluation on Mora approximately fifteen months prior to the competency hearing. Due to personal reasons, Dr. Spencer was not able to perform another competency evaluation prior to the competency hearing. However, Dr. Spencer noted that he had on two recent occasions observed Mora interact in court proceedings. Dr. Spencer indicated that he felt comfortable with his conclusion that Mora was competent based on these additional observations.
[12] As we reverse for a new penalty phase, we need not address Mora's argument that the trial court erred in not holding a competency hearing prior to sentencing even though the trial court had appointed experts for a competency evaluation.
[13] The trial court conducted an exhaustive discussion with counsel and Mora consistent with Hardwick v. State, 521 So.2d 1071, 1074-75 (Fla.1988) (adopting the procedure required in Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973)), to inquire into Mora's complaints that his trial counsel was deficient. The trial court found there was no reasonable cause to believe that Colleran was rendering ineffective representation. After the trial court advised Mora that he was not entitled to another set of lawyers, Mora indicated that he did not want to proceed pro se but wanted certain directions relating to his case to be followed.
[14] Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[15] The record also indicates that several of the mental health professionals who testified in the trial indicated that Mora told them that he had taken several of these pills that morning.
[16] Mora went to the sheriff's department to collect an incident report he previously filed.
[17] The record indicates that the trial court did not conduct a proper Faretta inquiry after conducting the Hardwick hearing. The trial court did note that it previously conducted a Faretta inquiry and had found Mora able to waive his counsel.
[18] As we reverse for a new sentencing proceeding, we do not address the other penalty phase issues.