889 So.2d 721 (2004)
Pedro HERNANDEZ-ALBERTO, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1617.
Supreme Court of Florida.
September 23, 2004.
Rehearing Denied December 10, 2004.
*723 James Marion Moorman, Public Defender and John C. Fisher, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Charles J. Crist, Jr., Attorney General, Katherine V. Blanco, Senior Assistant Attorney General and Kimberly Nolen Hopkins, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal two judgments of conviction of first-degree murder and two sentences of death. We have jurisdiction. *724 See Art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the judgments and sentences of death.

FACTUAL AND PROCEDURAL HISTORY
Pedro Hernandez-Alberto and Maria Gonzalez were married in 1996 after a courtship of several years. Maria had an adult son, Salvatore Gonzalez, an adult daughter, Isela Gonzalez, and a minor daughter, Donna Berezovsky. Hernandez-Alberto and Maria had one child together, Gabriella, who was an infant at the time of the homicides. Prior to and during their marriage, Maria lived with her children in her home in Apollo Beach, Florida, and she owned and operated a family business known as the Apollo Beach Family Restaurant.
On the morning of January 3, 1999, Hernandez-Alberto and Maria continued an ongoing argument about ownership of the home and business. Previously, Hernandez-Alberto insisted that Maria place his name on the title to the home and the business, which she had solely owned prior to their marriage. After continuing to deny his demands, Maria left the home to go to work at the restaurant. Upon her departure, Hernandez-Alberto put Gabriella in a back bedroom and then confronted his eleven-year-old stepdaughter, Donna, in the family room. He told Donna to pick up a toy. When she refused, he struck her on the head near the right ear, knocking her to the floor. He then removed a gun from his fanny pack and shot her as she lay face down. Donna died from the gunshot wound.
The medical examiner's testimony confirmed there was a contusion on Donna's face consistent with being struck with a hand. In addition, the autopsy indicated that the gunshot entered Donna's back, traveled through her spinal cord, aorta, lung, chest, and arm. The injuries were consistent with being shot while face down on the floor.
After shooting Donna, Hernandez-Alberto drove to the Apollo Beach Family Restaurant where Maria and Isela were working. Upon entering the back of the restaurant, Hernandez-Alberto went directly to the restroom where he remained for approximately eight to ten minutes. Upon exiting the restroom, he walked up behind Isela and shot her twice in the back. After she fell to the floor, he then shot her once in the head.
The medical testimony indicates that a gunshot to Isela's lower back passed through her hip and intestines before exiting the front of her body. A gunshot higher on her back penetrated her lung, diaphragm, spleen, pituitary gland, kidney, pancreas and stomach before exiting her body. The third gunshot to her neck hit her spine, then went through her carotid artery and jugular vein.
After the shooting, Hernandez-Alberto left the restaurant with a gun in his hand, got into his car, and fled toward Mexico. He was arrested in Brookshire, Texas, a small town near Houston. He was interviewed by the Brookshire police chief, Joe Garcia, and he confessed to shooting and killing both Donna and Isela. At the time of his arrest, Hernandez-Alberto had a gun, which was later determined to be the murder weapon, in his possession. A fanny pack was also found in his possession.
Throughout the trial, the defense contended that Hernandez-Alberto suffered from a mental illness and may have had brain damage, which he allegedly suffered as a result of an automobile accident with a Hillsborough County Sheriff's vehicle several years prior to the homicides. Throughout the trial, Hernandez-Alberto was uncooperative with his attorneys, the *725 investigators assigned to aid in his defense, and the doctors appointed to evaluate him. He also made repeated outbursts in the courtroom whereby he shouted profanities directed at the court and ultimately had to be removed on several occasions. At the beginning of the trial, he discharged his attorneys and invoked his constitutional right of self-representation. The court made a specific observation that Hernandez-Alberto conducted himself appropriately throughout the trial while representing himself, that he asked relevant questions of the witnesses, and that he attempted to make valid points in the presence of the jury. After both sides rested, Hernandez-Alberto made the decision to have his attorney make the closing argument for him.
On August 24, 2001, Hernandez-Alberto was convicted by a jury of two counts of first-degree premeditated murder. On November 29, 2001, the same jury recommended, by a vote of 10-2, that Hernandez-Alberto receive a sentence of death for each murder. On April 30, 2002, the trial court held a Spencer[1] hearing and allowed each side to present additional evidence and arguments. On May 28, 2002, the trial court agreed with the jury's recommendation and sentenced Hernandez-Alberto to death for each of the murders. The trial court found three aggravating circumstances for the murder of Donna Berezovsky, giving all three great weight: (1) the defendant had previously been convicted of another capital offense or of a felony involving the use of violence to some person; (2) the victim of the capital felony was a person less than twelve years of age; and (3) the victim of the capital felony was particularly vulnerable due to advanced age or disability or because the defendant stood in a position of familial or custodial authority over the victim. The trial court found two aggravating circumstances for the murder of Isela Gonzalez, giving both great weight: (1) the defendant had been previously convicted of another capital felony or of a felony involving the use of violence to some person; and (2) the crime for which the defendant was to be sentenced was committed in a cold, calculated, and premeditated manner and without any pretense of moral or legal justification.
The trial court considered the following statutory mitigating circumstances: (1) the defendant had no significant history of prior criminal activity (some weight); (2) the crime for which the defendant was to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance (no weight); (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (no weight); (4) the age of the defendant at the time of the crime (no weight); and (5) the existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty (some weight). The trial court found the following nonstatutory mitigating circumstances: (1) the defendant suffers from a brain injury (little weight); (2) the defendant lost his mother at an early age (little weight); (3) the defendant suffered frequent beatings by his father when the father was drinking (some weight); (4) the defendant suffered beatings and mistreatment at the hands of the neighbor who took him in after the father abandoned the defendant (little weight); (5) the defendant trained and worked as an auxiliary police officer in Mexico City (little weight); (6) the defendant was capable when young of maintaining loving and respectful relationships (little weight); (7) the defendant *726 lived in extreme poverty as a young child (no weight); (8) the defendant voluntarily provided a confession upon arrest (some weight); and (9) the defendant was of borderline intelligence (little weight).
Hernandez-Alberto now appeals both judgments and sentences.

DISCUSSION

Issue 1: Competency
Hernandez-Alberto asserts that he was incompetent to stand trial and that the trial court erred in this case by failing to hold competency hearings throughout the trial. We have outlined a trial court's role in the area of competency to stand trial as follows:
In determining whether a defendant is competent to stand trial, the trial court must decide whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding  and whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); see also § 916.12(1), Fla. Stat. (1993); Fla. R.Crim. P. 3.211(a)(1). In situations where there is conflicting expert testimony regarding the defendant's competency, it is the trial court's responsibility to consider all the evidence relevant to competency and resolve the factual dispute. Hunter v. State, 660 So.2d 244, 247 (Fla.1995), cert. denied, 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996); Watts v. State, 593 So.2d 198, 202 (Fla.1992). The trial court's competency decision will be upheld absent a showing of an abuse of discretion. Hunter, 660 So.2d at 247; Watts, 593 So.2d at 202.
Hardy v. State, 716 So.2d 761, 763-64 (Fla.1998).
On April 19, 1999, the trial court ordered a competency and sanity evaluation and psychiatric evaluation return to determine if Hernandez-Alberto was competent to stand trial. Both Dr. Michael S. Maher and Dr. Alfonso H. Saa determined that Hernandez-Alberto was incompetent to stand trial. On May 18, 1999, the trial court adjudged Hernandez-Alberto incompetent to stand trial and committed him to the Florida Department of Children and Families. While Hernandez-Alberto was committed to the South Florida Evaluation and Treatment Center in Miami, Dr. Fred J. Balzer, Dr. Andres L. Jimenez, Dr. Francisco A. Campos, and Hospital Administrator Cheryl Y. Brantley all determined that Hernandez-Alberto was malingering and competent to proceed. On July 13, 1999, the trial court ordered a second competency and sanity evaluation and psychiatric evaluation return to determine if Hernandez-Alberto was competent to stand trial. Dr. Maher and Dr. Saa again evaluated Hernandez-Alberto. On July 22, 1999, Dr. Saa concluded that Hernandez-Alberto was incompetent but stated, "However, I suspect that his clinical presentation, likely compatible with malingering, is coloring my conclusions." On August 6, 1999, Dr. Maher concluded that Hernandez-Alberto was competent to stand trial. On August 9, 2001, the trial court ordered a third competency and sanity evaluation and psychiatric evaluation return to determine if Hernandez-Alberto was competent to stand trial. On August 15, 2001, Dr. Maher again concluded that Hernandez-Alberto was competent to stand trial. On August 16, 2001, Dr. Robert M. Berland concluded that he might have "a genuine psychotic disturbance." The trial court concluded that Hernandez-Alberto was competent to stand trial at this time, and the trial commenced on August 20, 2001. On August 24, 2001, the *727 jury found Hernandez-Alberto guilty on both counts of first-degree murder.
On November 16, 2001, defense counsel filed a motion for reconsideration of competency, alleging that Dr. Berland had done additional work on the issue and was prepared to state definitively that the defendant had a mental illness and was incompetent. Prior to the penalty phase on November 19, 2001, the trial court revisited the issue of competency. Dr. Berland was allowed to elaborate on his findings concerning Hernandez-Alberto's competency. The new information which formed the basis of Dr. Berland's "definitive" opinion was a conversation with the defendant's ex-wife. At the conclusion of that hearing, the trial court stated:
THE COURT: Initially in this case, I found that he was incompetent to proceed and had him transferred to the state hospital. While at the state hospital, they made extensive observations of Mr. Hernandez Alberto, and their final conclusion was that he was malingering. He was sent back to Hillsborough County, where he has just totally refused to cooperate with his attorneys, with all of the doctors that the Court has appointed, and to this day he continues to be uncooperative. I have previously found that Mr. Hernandez Alberto was competent to proceed, and I believe that presumption remains with Mr. Hernandez Alberto today. I'll make a few other observations. One was that Dr. Maher had the opportunity to make some observations of Mr. Hernandez Alberto, and, based upon his observations, felt that he was competent to proceed, that he had conducted himself appropriately in the courtroom. Also when Mr. Hernandez Alberto represented himself throughout the trial, I made a particular note that he conducted himself appropriately in the courtroom and was able to ask what I felt were some competent questions in his defense. Therefore, I'm going to find that Mr. Hernandez Alberto remains competent to proceed to the penalty phase of this proceeding.
The penalty phase was conducted on November 28 and 29, 2001. At the conclusion of the penalty phase, the jury recommended by a vote of 10-2 that Hernandez-Alberto receive the death penalty as to both counts of first-degree murder. Prior to the Spencer hearing on April 30, 2002, the trial court granted Hernandez-Alberto's motion for a PET scan.[2] However, Hernandez-Alberto refused to cooperate and did not allow a PET scan to be performed on him.
The record supports the trial court's resolution of the factual disputes on the issue of competency. Five medical experts, after having observed and examined Hernandez-Alberto, informed the trial court that he was malingering and competent to proceed. Yet another expert opined that Hernandez-Alberto's presentation was compatible with malingering. Dr. Berland initially opined that Hernandez-Alberto might have a genuine psychosis. After talking with Hernandez-Alberto's ex-wife, Dr. Berland stated the defendant was not competent. Even though there is conflicting evidence on the issue, the trial court's determination is supported by competent, substantial evidence and will not be disturbed on this appeal. See Evans v. State, 800 So.2d 182, 188 (Fla.2001) ("Even when the experts' reports conflict, it is the function of the trial court to resolve such factual disputes, and the trial court's determination should be upheld absent an abuse of discretion."). As there was evidentiary support in the record for the trial *728 court's decision, we will not disturb the trial court's competency determination. See Mora v. State, 814 So.2d 322, 327 (Fla.) ("In situations where there is conflicting expert testimony regarding the defendant's competency, it is the trial court's responsibility to consider all the evidence relevant to competency and resolve the factual dispute."), cert. denied, 537 U.S. 1050, 123 S.Ct. 603, 154 L.Ed.2d 526 (2002).
The trial judge held hearings on Hernandez-Alberto's competency at various stages of the trial proceedings and did not err in finding him competent to stand trial.

Issue 2: Pro Se Representation
Hernandez-Alberto next asserts that the trial court erred in allowing him to proceed pro se at trial. From the time of his arrest until the third day of his trial, Hernandez-Alberto had been represented at different times by two sets of attorneys. At some point he requested that both sets be discharged. Prior to discharging each set of attorneys, the trial court conducted a Nelson hearing. Such a hearing is required:
[W]here a defendant, before the commencement of trial, makes it appear to the trial judge that he desires to discharge his court appointed counsel, the trial judge, in order to protect the indigent's right to effective counsel, should make an inquiry of the defendant as to the reason for the request to discharge. If incompetency of counsel is assigned by the defendant as the reason, or a reason, the trial judge should make a sufficient inquiry of the defendant and his appointed counsel to determine whether or not there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant. If reasonable cause for such belief appears, the court should make a finding to that effect on the record and appoint a substitute attorney who should be allowed adequate time to prepare the defense. If no reasonable basis appears for a finding of ineffective representation, the trial court should so state on the record and advise the defendant that if he discharges his original counsel the State may not thereafter be required to appoint a substitute. See Wilder v. State, Fla.App.1963, 156 So.2d 395, 397. If the defendant continues to demand a dismissal of his court appointed counsel, the trial judge may in his discretion discharge counsel and require the defendant to proceed to trial without representation by court appointed counsel.
Nelson v. State, 274 So.2d 256, 258-59 (Fla. 4th DCA 1973).
After both Nelson hearings, the trial court concluded that Hernandez-Alberto had been zealously represented. However, at the conclusion of the first Nelson hearing, the trial court nonetheless discharged counsel and appointed substitute counsel. Prior to discharging the second set of attorneys and prior to opening statements, the trial court warned Hernandez-Alberto that substitute counsel would not be appointed and asked Hernandez-Alberto if he still wished to discharge his counsel and represent himself. When Hernandez-Alberto indicated that he wished to discharge his counsel, the trial court conducted a Faretta inquiry.
When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, *729 he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and that his choice is made with his eyes open."
Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (citations omitted). During the Faretta inquiry, Hernandez-Alberto indicated that he understood the charges against him, that he wished to represent himself, and that he understood the consequences of representing himself. Hernandez-Alberto then represented himself for two days while his second set of counsel remained, as required by the trial court's order, as standby counsel.[3] During those two days, the trial court asked Hernandez-Alberto numerous times if he wished to have his counsel reappointed, and Hernandez-Alberto declined these invitations. On the morning of the final day of the guilt phase, Hernandez-Alberto moved for standby counsel to be reappointed prior to closing arguments, and the trial court granted his request.
Based upon the foregoing, we find that the trial court did not err in allowing Hernandez-Alberto to proceed pro se. As we stated in Bowen:
[O]nce a court determines that a competent defendant of his or her own free will has "knowingly and intelligently" waived the right to counsel, the dictates of Faretta are satisfied, the inquiry is over, and the defendant may proceed unrepresented. See Fla. R.Crim. P. 3.111. The court may not inquire further into whether the defendant "could provide himself with a substantively qualitative defense," Bowen, 677 So.2d at 864, for it is within the defendant's rights, if he or she so chooses, to sit mute and mount no defense at all.
State v. Bowen, 698 So.2d 248, 251 (Fla.1997). Although Hernandez-Alberto's self-representation did not result in a favorable outcome, the trial court committed no error in allowing Hernandez-Alberto to represent himself, because the record demonstrates that the trial court properly conducted a Faretta hearing. As explained by the United States Supreme Court in Faretta:
It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."
*730 Faretta, 422 U.S. at 834, 95 S.Ct. 2525.[4] The trial court did not err in allowing the defendant to exercise his right to represent himself in this case.

Issue 3: Motion for Continuance
Hernandez-Alberto further claims the trial court erred in denying his motion for a continuance after the trial court permitted him to proceed pro se. We have repeatedly held that "[t]he denial of a motion for continuance is committed to the sound discretion of the trial judge." Lebron v. State, 799 So.2d 997, 1018 (Fla.2001), cert. denied, 535 U.S. 1036, 122 S.Ct. 1794, 152 L.Ed.2d 652 (2002). A "court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to [the] defendant. This general rule is true even in death penalty cases." Israel v. State, 837 So.2d 381, 388 (Fla.2002) (quoting Kearse v. State, 770 So.2d 1119, 1127 (Fla.2000), cert. denied, 539 U.S. 931, 123 S.Ct. 2582, 156 L.Ed.2d 611 (2003)). "While death penalty cases command our closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance." Cooper v. State, 336 So.2d 1133, 1138 (Fla.1976).
Hernandez-Alberto offered three reasons for his request for a continuance: (1) so that he could go to the library and familiarize himself with the law because he knew "almost nothing"; (2) so that he could obtain a copy of the indictment and read it over; and (3) so that he could have someone go to the library with him and translate from English to Spanish all of the related discovery documents in the case for him so that he could understand the State's case. The trial court addressed all three of Hernandez-Alberto's concerns, so a continuance was unnecessary. The trial court repeatedly warned Hernandez-Alberto that his unfamiliarity with the law was the main reason why it would be advantageous to remain represented by his counsel. Furthermore, the trial court appointed standby counsel to assist Hernandez-Alberto with the legal aspects of his case. The trial court recessed the guilt phase proceedings, gave Hernandez-Alberto a copy of the indictment, and allowed him to read the indictment in his cell. Leann Goudie, one of the attorneys initially assigned to represent Hernandez-Alberto, testified that she had traveled to the jail on two occasions to visit Hernandez-Alberto and translated the discovery documents into Spanish so that he could understand the charges and evidence against him. Furthermore, Caroline Fulgueira, a mitigation specialist hired by the Office of the Public Defender, testified that she played to Hernandez-Alberto the taped confession he made to the Brookshire police chief. This tape was a major piece of evidence against him in the State's case. Hernandez-Alberto even admitted that Fulgueira had in fact played the tape for him. The trial court thoroughly considered and addressed the reasons proffered for a continuance. Therefore, the trial court did not abuse its discretion in denying Hernandez-Alberto's pro se motion for a continuance.

Issue 4: PET Scan
Hernandez-Alberto also asserts the trial court erred in initially denying his *731 motion for a PET scan. Because he was given an opportunity to have a PET scan but refused to cooperate, we deny relief on this issue. In Rogers v. State, 783 So.2d 980 (Fla.2001), we stated the criteria to be applied by trial courts in making a determination regarding the necessity for a PET scan. We said:
A trial court's decision to deny a defendant's motion for a PET-Scan will not be disturbed absent an abuse of discretion. In evaluating whether the trial court abused its discretion, this Court generally looks at two factors. First, before the trial court will provide a defendant with the necessary funds for a PET-Scan, the defendant must establish a particularized need for the test, that is, that the test is necessary for experts to make a more definitive determination as to whether the defendant's brain is functioning properly and to provide their opinions about the extent of the defendant's brain damage. Second, this Court must consider whether the defendant was prejudiced by the trial court's denial of the motion requesting a PET-Scan.
Id. at 998-99 (citations omitted).
On March 21, 2001, Hernandez-Alberto filed a motion for a PET scan to help in preparation for the sentencing phase. In the motion Hernandez-Alberto pointed to Dr. Berland's March 8, 2001, affidavit which recommended that the defendant receive a PET scan in order to "contribute critical and otherwise unavailable information about the presence of injured brain tissue which which [sic] may have been caused by the auto accident described above [Hernandez-Alberto's accident with a Hillsborough County sheriff], or in other, unknown incidents in the defendant's history." Although the trial court initially denied the motion for a PET scan on January 7, 2002, the trial court reversed itself and ordered that $2500 be allotted for a PET scan. This order was entered three months prior to the April 30 Spencer hearing. Had the test been done, the results of the PET scan would have been available for argument as mitigation at the Spencer hearing. However, Hernandez-Alberto refused to allow a PET scan to be performed on him. He now claims that, although he refused to cooperate with a PET scan prior to the Spencer hearing, he might have cooperated with a PET scan prior to the guilt and penalty phase hearings, and he may cooperate with PET scan testing on remand. He concedes that when given the opportunity he did not allow the PET scan.
It is clear that the trial court afforded Hernandez-Alberto the opportunity for a PET scan, and he refused to take advantage of it. As a result, he has failed to demonstrate that he was prejudiced by the trial court's initial decision to deny the PET scan. Therefore, error has not been demonstrated.

Issue 5: Premeditation
Hernandez-Alberto next asserts that there was insufficient evidence of premeditation as to count one, the murder of Donna Berezovsky. In Johnston v. State, 863 So.2d 271 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004), we reiterated our definition of premeditation, and said:
Premeditation is defined as "a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which an act of killing ensues." Blackwood v. State, 777 So.2d 399, 406 (Fla.2000) (quoting Sireci v. State, 399 So.2d 964, 967 (Fla.1981)). Premeditation may be "formed in a moment and need only exist `for such time as will allow the accused to be conscious of the nature of *732 the act he is about to commit and the probable result of that act.'" Blackwood, 777 So.2d at 406 (quoting DeAngelo v. State, 616 So.2d 440, 441 (Fla.1993)).
Id. at 285. The facts and circumstances of Donna Berezovsky's death indicate that the defendant had sufficient time to form the state of mind necessary for premeditated murder.
During direct examination, the former chief of police for Brookshire, Texas, Joe Garcia, recounted Hernandez-Alberto's taped confession, in which Hernandez-Alberto admitted that he took his own daughter, Gabriella, and placed her in a bedroom before he confronted Donna in the family room. He asked Donna to pick up a toy, and when she refused, he hit her in the head. Donna fell on the floor. Hernandez-Alberto then removed a gun from his fanny pack and fired a shot into her back as she lay face down. These actions demonstrate there was sufficient time for Hernandez-Alberto to be conscious of and reflect on his actions. Therefore, this issue is without merit.

Issue 6: Proportionality
On the issue of sentencing, Hernandez-Alberto argues that the death penalty is not appropriate because it is not proportional and is premised on inapplicable aggravating factors and the improper disregard of critical mitigating factors. "In deciding whether death is a proportionate penalty, we must consider the totality of the circumstances of the case and compare the case with other capital cases. We also must remain mindful that the death penalty is reserved for the most aggravated and least mitigated of first-degree murders." Johnson v. State, 720 So.2d 232, 238 (Fla.1998) (citations omitted).
The trial court found three aggravating circumstances applicable to the murder of Donna Berezovsky: (1) previous violent felony conviction; (2) victim less than twelve years old; and (3) vulnerable victim. The trial court found two aggravating circumstances applicable to the murder of Isela Gonzalez: (1) previous violent felony conviction and (2) CCP.[5] All of the aggravating factors were given great weight.
The trial court considered and analyzed the following mitigating circumstances: (1) no significant criminal history (some weight); (2) extreme mental or emotional disturbance (no weight); (3) substantial impairment (no weight); (4) age of the defendant (no weight); and (5) the defendant's background (some weight) and a number of nonstatutory circumstances.
A comparison of this case to other capital cases with similar aggravating and mitigating circumstances demonstrates that Hernandez-Alberto's sentence of death is proportional. See Zakrzewski v. State, 866 So.2d 688 (Fla.2003) (finding death sentence proportional in case where defendant murdered his wife and two young children with three aggravating circumstances of previous conviction of another capital offense, HAC, and CCP; statutory mitigating circumstances of no significant prior criminal history and that the murders were committed while the defendant was under the influence of an extreme mental or emotional disturbance; and a number of nonstatutory mitigating circumstances); Lynch v. State, 841 So.2d 362 (Fla.) (finding death sentence proportional in case where defendant murdered his mistress and her thirteen-year-old daughter with three aggravating circumstances as to the murder of the mistress: CCP, *733 prior violent felony conviction, and the murder was committed while defendant was engaged in one or more other felonies; three aggravating circumstances as to the murder of the daughter: HAC, prior violent felony conviction, and the murder was committed while defendant was engaged in one or more other felonies; statutory mitigating circumstance of no significant history of prior criminal activity; and a number of nonstatutory mitigating circumstances, including mental or emotional disturbance and substantial impairment), cert. denied, 540 U.S. 867, 124 S.Ct. 189, 157 L.Ed.2d 123 (2003); Rimmer v. State, 825 So.2d 304 (Fla.) (finding death sentence proportional in case where defendant murdered two people during a robbery with aggravating circumstances that the murders were committed by a person convicted of a felony and under a sentence of imprisonment, the defendant was previously convicted of another capital felony and a felony involving use or threat of violence to the person, the murders were committed while the defendant was engaged in a robbery and kidnapping, the murders were committed for the purpose of avoiding or preventing lawful arrest, HAC, and CCP; no statutory mitigating circumstances; and a number of nonstatutory mitigating circumstances, including a troubled family background and diagnosis of a schizoaffective disorder), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002). Therefore, we conclude that death is a proportionate penalty in this case.

Issue 7: Ring[6] Claim
Lastly, Hernandez-Alberto asserts that Florida's capital sentencing statute is unconstitutional. We have repeatedly rejected such challenges. See, e.g., Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002). Hernandez-Alberto specifically argues that Florida's capital sentencing scheme is unconstitutional because (1) the State is not required to provide notice of the aggravating circumstances it intends to establish at the penalty phase; (2) the jury is not required to make any specific findings regarding the existence of aggravating circumstances, or even of a defendant's eligibility for the death penalty; (3) there is no requirement of jury unanimity for finding individual aggravating circumstances or for making a recommendation of death; and (4) the State is not required to prove the appropriateness of the death penalty. We have rejected each of these assertions. See, e.g., Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003) (rejecting argument that aggravating circumstances must be alleged in the indictment, submitted to the jury, and individually found by a unanimous jury verdict); Kormondy v. State, 845 So.2d 41, 54 (Fla.) ("While Ring makes Apprendi[7] applicable to death penalty cases, Ring does not require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury."), cert. denied, 540 U.S. 950, 124 S.Ct. 392, 157 L.Ed.2d 283 (2003). Additionally, the assertion that the State does not have to prove the appropriateness of the death penalty is simply without merit. In a criminal prosecution the State always has the burden of proof, and in the sentencing context the State bears that burden by proving the existence of each aggravating circumstance beyond a reasonable doubt. See Clark v. State, 443 So.2d 973, 976 (Fla.1983) ("The burden is upon the state in the sentencing portion of a capital felony trial *734 to prove every aggravating circumstance beyond a reasonable doubt."). Therefore, this claim is without merit.

CONCLUSION
Based on the foregoing, we affirm Hernandez-Alberto's conviction for two counts of first-degree murder and the two sentences of death.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs specially with an opinion.
BELL, J., concurs specially with an opinion, in which WELLS, J., concurs.
ANSTEAD, J., concurs as to the conviction and concurs in result only as to the sentence.
PARIENTE, C.J., specially concurring.
I concur in the affirmance of the convictions and sentences in this case, but write separately to address the majority's discussion on the constitutionality of the death sentences under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). I cannot agree with the majority's conclusion that there is no constitutional requirement of a unanimous finding of a death-qualifying aggravating circumstance. As I have previously stated, I believe that the Sixth Amendment dictates of Ring and the right to trial by jury in article I, section 22 of the Florida Constitution combine to require that the jury unanimously find an aggravating factor that makes the defendant eligible for the death penalty. See Butler v. State, 842 So.2d 817, 836 (Fla.2003) (Pariente, J., dissenting).
Although the jury vote recommending death in this case was not unanimous, the aggravator of previous conviction of a violent felony removes the death sentence from the requirements of Ring and article I, section 22. See Doorbal v. State, 837 So.2d 940, 964 (Fla.) (Pariente, J., concurring as to the conviction and concurring in result only as to the sentence) (stating that the prior violent felony aggravator makes it unnecessary to determine whether the nonunanimous recommendation renders the death sentence unconstitutional), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Accordingly, Hernandez-Alberto's death sentence does not violate his federal or state constitutional guarantees to a jury trial.
BELL, J., specially concurring.
I fully concur with the majority opinion. I write separately simply to commend the trial judge for his unfaltering patience and painstaking attention to the numerous procedural and substantive issues that arose in this difficult case. His professionalism throughout these proceedings was exemplary.
WELLS, J., concurs.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] Positron emission tomography (or PET scan) is a medical test often used to detect tumors and monitor a patient's brain function.
[3] The "State may  even over objection by the accused  appoint a `standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." Faretta, 422 U.S. at 835 n. 46, 95 S.Ct. 2525.
[4] Accord Bowen, 698 So.2d at 250 ("The federal Court in Faretta made no provision for an additional layer of protection requiring courts to ascertain whether the defendant is intellectually capable of conducting an effective defense. Such a requirement would be difficult to apply and would constitute a substantial intrusion on the right of self-representation.").
[5] As we stated in Larkins v. State, 739 So.2d 90, 95 (Fla.1999), the CCP aggravator is one of the "most serious aggravators set out in the statutory sentencing scheme."
[6] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[7] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).