910 So.2d 167 (2005)
Lucious BOYD, Appellant,
v.
STATE of Florida, Appellee.
No. SC02-1590.
Supreme Court of Florida.
February 10, 2005.
As Revised on Denial of Rehearing June 16, 2005.
Rehearing Denied August 24, 2005.
*174 Carol Stafford Haughwout, Public Defender, and Gary Lee Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal judgments of conviction of first-degree murder, armed kidnapping, and sexual battery, and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and the sentence of death.

FACTS
The evidence presented at trial revealed the following facts. In the early morning hours of December 5, 1998, Dawnia Dacosta's car ran out of gas while she was on her way to her home in Deerfield Beach, Florida, from a midnight church service. She had just exited from Interstate 95 (I-95) onto Hillsboro Beach Boulevard and pulled onto the shoulder. She then took a red gas can she kept in her car, walked about a block east to a nearby Texaco gas station, and bought a gallon of gas. At approximately 2 a.m., during the time she was at the gas station, Dacosta spoke with two other customers, Lisa Bell and Johnnie Mae Harris. She asked Bell for a ride back to her car, but Bell had walked to the station and so could not give Dacosta a ride. Bell and Harris then watched Dacosta speak with a black male in a van in the station's parking lot. Harris asked the man if he was going to help Dacosta, and the man nodded, indicating yes. Bell later told the police that the van she saw was greenish-blue in color, while Harris said that she thought the van was burgundy. Though somewhat unsure about the van's color, Harris was certain that she saw the word "Hope" on its side. In a photo line-up and at trial, Harris identified the man *175 she saw in the van that night as Lucious Boyd.
Boyd spent the evening of December 4 with Geneva Lewis, his girlfriend, at her mother's home. Boyd left the house around 10 or 11 p.m., and Lewis did not see him again until the morning of December 5, at around 9 or 10 a.m. Lewis testified that on December 4 and 5, Boyd was driving a green church van with writing on its side and that the van belonged to Reverend Frank Lloyd of the Hope Outreach Ministry Church, for whom Boyd performed occasional maintenance work.
Dacosta's family began searching for her after she did not return home on December 5. They found her car at an I-95 exit and began circulating fliers with Dacosta's photograph, indicating that she was missing, throughout the area. Bell and Harris saw the fliers, recognized Dacosta as the woman with the gas can at the Texaco station on December 5, and contacted the police with their information.
On December 7, Dacosta's body was discovered in an alley behind a warehouse on 42nd Street in Deerfield Beach. The body was wrapped in a shower curtain liner, a brown, flat bed sheet, and a yellow, flat bed sheet. A purple duffel bag and two large black trash bags covered her head. It was determined that she had been dead for between thirty-six and seventy-two hours.
At trial, it was stipulated that Dacosta died due to a penetrating head wound and that the bruising on her head was consistent with but not exclusive to the face plate of a reciprocating saw. Wounds to her chest, arms, and head were consistent with but not exclusive to a Torx brand torque screwdriver, and she had defensive wounds on her arms and hands. There was bruising to her vagina that was consistent with sexual intercourse, although the medical examiner could not determine whether the intercourse was consensual or nonconsensual. Dacosta had thirty-six superficial wounds on her chest, four on the right side of her head, and twelve on her right hand, some being consistent with defensive wounds and some being consistent with bite marks. One fatal wound to the head perforated the skull and penetrated Dacosta's brain.
On March 17, 1999, while Detectives Bukata and Kaminsky of the Broward County Sheriff's Office were investigating another crime unrelated to Dacosta's death, they saw a green van in the Hope Outreach Ministry Church parking lot. The van had burgundy writing on it that read "Here's Hope." Bell would later identify the church's van as the same van she had seen on the morning of December 5 at the Texaco station. The detectives decided to investigate, and their inquiries as to the owner of the van led them to Reverend Lloyd. When the detectives questioned Lloyd about the location of the van on the night of December 4, Lloyd's secretary, who was present at the questioning, remarked that Lucious Boyd had driven the van on that weekend. On December 4, Boyd had taken Reverend Lloyd to pick up a rental car in the church's green 1994 Ford van. Reverend Lloyd further testified that he instructed Boyd to take the van back to the church but that Boyd did not return the van until Monday, December 7. Reverend Lloyd also stated that when he left the van with Boyd, various tools owned by the church, including a set of Torx brand screwdrivers and a reciprocating saw, were in the van, as well as a purple laundry bag that the pastor used to deliver his laundry to the cleaners. When Reverend Lloyd returned on December 15, he discovered that the screwdrivers, the saw, and the laundry bag were missing.
Boyd was arrested for Dacosta's murder on March 26, 1999. Seminal fluid taken *176 from Dacosta's inner thigh matched the DNA profile of Boyd. Tests also did not eliminate Boyd as a match for a hair found on Dacosta's chest. A DNA profile consistent with Boyd's was found in material taken from under Dacosta's fingernails. In addition, fingerprints taken from the trash bag found around the victim's head matched fingerprints of Boyd's girlfriend, Geneva Lewis, and her son, Zeffrey Lewis. Tire marks on a sheet covering the victim's body were consistent with the tires on the church van, although trial expert Terrell Kingery, a senior crime laboratory analyst for the Orlando Regional Crime Laboratory, testified that he could not say for certain that the van's tires made the marks because over 1.5 million tires could have made the tracks on the sheet. Dr. Steven Rifkin, a private dentist and a forensic odontologist with the Broward County Medical Examiner's Office, testified that bite marks on Dacosta's arm were, within a reasonable degree of certainty, made by Boyd's teeth.
On April 1, Detective Bukata obtained a warrant to search the apartment of Boyd and Lewis, which was a block east of the Texaco station. Detective Bukata arrived at the apartment and told Lewis to leave with her children for a few days so that the officers could fully search the apartment. The investigators found blood at various locations throughout the apartment. Blood found on the underside of the carpet and on the armoire matched Dacosta's DNA profile. The shower curtain rings were unsnapped, and there was no liner to the shower curtain. Carpet fibers taken from the yellow sheet in which Dacosta's body was wrapped matched characteristics of carpet samples taken from Boyd's apartment.
Lewis had previously lived with Boyd at his apartment but had moved out in October of 1998. While living with Boyd, Lewis had purchased a queen-size bed, which she left at the apartment when she moved. Lewis and her three children moved back in with Boyd in February of 1999 and discovered that the bed was no longer at Boyd's apartment. When she asked about it, Boyd told her that he had given it away but would get it back. When she inquired about it again, Boyd told her that she would not want that bed and that he would get her another one. Lewis also identified the flat bed sheets, one brown and one a "loud yellow," that were found around Dacosta's body as similar to ones she had owned while living at Boyd's apartment but that she no longer knew where they were or if they were at Boyd's apartment or at her mother's home.
A jury convicted Boyd of first-degree murder, sexual battery, and armed kidnapping. The trial court subsequently conducted a penalty phase proceeding, during which both sides presented evidence. The jury unanimously recommended that Boyd be sentenced to death. The trial court followed the jury's recommendation and imposed a death sentence, finding and weighing two aggravating factors,[1] one statutory mitigating factor,[2] and five non-statutory mitigating factors.[3]State v. *177 Boyd, No. 99-5809 (Fla. 17th Cir. Ct. order filed June 21, 2002) (sentencing order). The trial court also sentenced Boyd to fifteen years' imprisonment for the sexual battery and to life imprisonment for the armed kidnapping charges.
Boyd appeals his convictions and the trial court's sentence of death, raising fifteen issues.[4]

ISSUE 1. JUROR MISCONDUCT
Boyd argues that the trial court erred in refusing to make an inquiry of the jurors and in denying a mistrial upon hearing testimony that jurors had discussed extrajudicial information. Following Boyd's presentation of mitigation evidence, Margaret Woods-Alcide, a friend of Boyd's family, provided a letter to the court in which she alleged that she had overheard jurors in the restroom discussing extrajudicial information during the guilt phase of the trial. According to Woods-Alcide, three female jurors spoke about Boyd's past crimes, and one stated that Boyd's father had in the past always saved him from legal troubles. Although the procedure followed by the deputies throughout the trial was to keep the jurors sequestered from the public, making it unlikely this incident could have occurred, the trial court held a hearing concerning the allegation and heard testimony from Woods-Alcide. In her testimony, Woods-Alcide could not remember precisely when this conversation had occurred but stated that it was just before the jury began deliberation. She could only vaguely identify which jurors had been in the restroom and stated that two were white and one was black. Woods-Alcide told the court that she did not have a very good memory because of a brain tumor she had had removed in 1993. She claimed to know one of the jurors she saw in the restroom, but she could not recall how she knew the juror or the juror's name.
During the State's examination, Woods-Alcide stated that she had informed Boyd *178 of the juror incident on the previous Saturday or Sunday, which was nearly five weeks after the alleged incident had taken place. Woods-Alcide stated that she had not told Boyd sooner because she did not want to tell him about the incident in the courtroom in front of his mother and was waiting for him to call. She could not remember at what time of day the incident had occurred, but she knew it was in the afternoon during a break in the trial. The rest of her letter about this incident included six observations that she made about the sufficiency of the State's evidence. The trial court denied Boyd's motion to conduct an inquiry of the jurors or grant a mistrial.
Dealing with allegations of juror misconduct is within the discretion of the trial court. Doyle v. State, 460 So.2d 353, 357 (Fla.1984). Before making an inquiry, a court is to determine whether the allegations of juror misconduct constitute "matters that inhere in the verdict and are subjective in nature, or are extrinsic to the verdict and objective." Marshall v. State, 854 So.2d 1235, 1240 (Fla.2003). Once it is determined that the misconduct does not inhere in the verdict, the trial court may make a judicial inquiry. However, the trial court may also decide not to make an inquiry when the allegations are "frivolous or incredible." Id. at 1244 (quoting State v. Brown, 235 Conn. 502, 668 A.2d 1288, 1305 (1995)).
We hold that the trial court did not err in refusing to question the jury about Woods-Alcide's allegations. The trial court made a judicial inquiry into the alleged incident by taking testimony from Woods-Alcide. That testimony revealed that Woods-Alcide was confused about which jurors had been involved in the incident, when the incident had occurred, and why she had waited so long to come forward with these allegations. The trial court also could have concluded Woods-Alcide was not credible because the standard procedure was to prohibit the jury from mingling with the public during their breaks. The trial court continued to inquire as to whether the jurors had discussed the trial with or in the presence of third parties, or whether they had received any outside information. The jurors always responded that they had not. The trial court did not entertain any "serious doubt" as to whether juror misconduct had occurred because of the incredibility of the witness and the circumstances of the alleged incident. See Baptist Hosp. of Miami, Inc. v. Maler, 579 So.2d 97, 100 (Fla. 1991).
The trial court did not abuse its discretion in coming to this decision, because a trial court has the discretion to not make an inquiry when it concludes that misconduct allegations are not credible. See Shere v. State, 579 So.2d 86, 95 (Fla. 1991) (trial court did not abuse its discretion in not making inquiry of jurors or granting mistrial when anonymous letter to newspaper alleged juror misconduct). Competent, substantial evidence supports this decision because Woods-Alcide's testimony regarding the incident was neither coherent nor credible. We therefore find no error in the trial court's denial of Boyd's motion to make an inquiry of the jury.
Boyd also argues that the trial court should have granted a mistrial. A new trial may be granted following a conviction if "[n]ew and material evidence, which, if introduced at the trial would probably have changed the verdict or finding of the court, and which the defendant could not with reasonable diligence have discovered and produced at the trial, has been discovered." Fla. R.Crim. P. 3.600(a)(3). For the above-stated reasons *179 regarding the trial court's assessment of Woods-Alcide's credibility, we hold that the trial court did not abuse its discretion in denying Boyd's motion for a mistrial.

ISSUE 2. DISCOVERY CLAIMS
Boyd next argues that the trial court reversibly erred in overruling the defense's request for Brady material, denying the defense motion to strike the testimony of the fingerprint examiner, and not conducting a Richardson hearing. The testimony at the heart of this claim was that of Thomas Mesick, a latent fingerprint examiner for the Broward County Sheriff's Office. Although seven fingerprints were found on the trash bag covering Dacosta's head, only three were of value. Mesick examined these three fingerprints and matched two of them to Geneva Lewis, Boyd's girlfriend, and Zeffrey Lewis, her son. Before he made these matches, Mesick digitally enhanced the prints and ran them through the Automated Fingerprint Identification System (AFIS), which returned a list of possible matches from across the state. Upon further examination, Mesick determined that none of those possibilities were actual matches for the prints. He then discarded the list, which might have included twenty to fifty possible matches. Mesick testified, outside of the presence of the jury, that unless an actual match is made, it was his routine to discard the list. Defense counsel asked that the court either order the list regenerated or strike Mesick's testimony from the record because this list was favorable evidence withheld in violation of Brady. The trial court denied the defendant's motion, finding there was no reasonable possibility that the list could be recreated as it had appeared when it was made, which was two to three years prior to trial, and it contained no material the exclusion of which was detrimental or prejudicial to the defendant.
The Brady rule requires that the prosecution not suppress evidence favorable to an accused where that "evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S.Ct. 1194. We have stated that the three elements required to make a Brady claim are:
(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice to the defendant must have ensued.
Lugo v. State, 845 So.2d 74, 105 (Fla.); cert. denied, 540 U.S. 920, 124 S.Ct. 320, 157 L.Ed.2d 216 (2003).
We hold that Boyd's Brady claim is without merit. The defense was not prejudiced by the absence of the list of potential matches to the fingerprints. Two of the prints on the bag actually matched the fingerprints of Geneva and Zeffrey Lewis, who lived with Boyd up until a few months before the crime. The third print was not matched because it was not clear what part of the body the print came from (i.e., it could have been a palm or footprint). Mesick determined that the list of potential matches generated by the AFIS had no actual matches to the fingerprints on the bag. A list of potential matches, with no actual matches, was not material to Boyd's defense. This motion, at best, raised only the mere possibility that there could have been a print on the trash bag not belonging to Boyd or someone in Boyd's household, and "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." United States v. *180 Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Given the substantial amount of other evidence against Boyd, there is no reasonable probability that this list would have affected the outcome at trial. Hegwood v. State, 575 So.2d 170, 172 (Fla.1991). Thus, we hold that no Brady violation occurred.
Once a defendant asserts a discovery violation, a hearing is required before the trial court may conclude that the defendant was not prejudiced by the prosecution's discovery violation. State v. Hall, 509 So.2d 1093, 1096 (Fla.1987). This inquiry should "cover at least such questions as whether the state's violation was inadvertent or willful, whether the violation was trivial or substantial, and most importantly, what effect, if any, did it have upon the ability of the defendant to properly prepare for trial." Richardson v. State, 246 So.2d 771, 775 (Fla.1971) (quoting Ramirez v. State, 241 So.2d 744, 747 (Fla. 4th DCA 1970)).
We hold that Boyd's claim is meritless because the trial court conducted a hearing sufficient to satisfy Richardson. Both parties had an opportunity to question the fingerprint examiner, outside of the presence of the jury, as to why he discarded the list. Mesick explained that the list contained no actual matches, and thus he discarded it, as was his routine practice. The trial court was presented competent, substantial evidence as to why the list did not exist, that the discarding of the list was not willfully meant to prejudice the defense, and that any violation was not harmful to the defendant's case. The trial court could thus properly conclude that any potential discovery violation did not prejudice the defendant. We hold that the trial court properly conducted a Richardson hearing after the defense asserted the discovery violation, and we find no error.

ISSUE 3. SUFFICIENCY OF THE EVIDENCE
Boyd asserts that the evidence presented at trial was not sufficient to support the verdicts for sexual battery, premeditated murder, and armed kidnapping and that the trial court erred in denying the motions for judgment of acquittal on these charges. We assess a trial court's ruling on a motion for judgment of acquittal on a de novo standard of review and affirm the conviction if it is supported by competent, substantial evidence. Pagan v. State, 830 So.2d 792, 803 (Fla.2002).
A trial court should not grant a motion for judgment of acquittal "unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). However, a special standard of review applies when a case is based wholly on circumstantial evidence. Darling v. State, 808 So.2d 145, 155 (Fla.2002). In considering a motion for a judgment of acquittal in a circumstantial evidence case,
[i]t is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences.... The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. See Toole v. State, 472 So.2d 1174, 1176 (Fla.1985). Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
*181 State v. Law, 559 So.2d 187, 189 (Fla.1989) (footnote omitted). Thus, if the State's evidence creates an inconsistency with the defendant's theory of innocence, the trial court should deny the motion for judgment of acquittal and allow the jury to resolve the inconsistency. Woods v. State, 733 So.2d 980, 985 (Fla.1999). Boyd's theory of innocence as to the sexual battery, premeditated murder, and armed kidnapping charges was that he had never met Dacosta and that the evidence against him was planted by Detective Bukata.

Sexual Battery Charge
We hold that Boyd's motion for judgment of acquittal as to the sexual battery charge was properly denied by the trial court. Section 794.011(3), Florida Statutes (1997), provides in pertinent part:
A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury commits a life felony....
Sexual battery is defined as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another." § 794.011(1)(h), Fla. Stat. (1997). Consent is defined as "intelligent, knowing, and voluntary consent and does not include coerced submission. `Consent' shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender." § 794.011(1)(a), Fla. Stat. (1997).
The State presented substantial evidence that Boyd sexually battered Dacosta, including evidence that Boyd and Dacosta did not know each other before she encountered Boyd while looking for a ride back to her vehicle after obtaining gas at the Texaco station; that Boyd's semen was on Dacosta's inner thighs; that Dacosta's blood was in Boyd's apartment; and that Boyd's DNA was in material found under Dacosta's fingernails. The State also presented testimony establishing the chain of custody of the evidence collected, providing evidence against Boyd's theory that Detective Bukata planted evidence so that it would match Boyd's and Dacosta's DNA. Bruising on Dacosta's inner thighs and vaginal area was consistent with either consensual or nonconsensual intercourse. Dacosta was last seen alive with Boyd. Viewing this evidence in a light most favorable to the State, the evidence does create inconsistencies with Boyd's theory of innocence, and the judgment of acquittal was therefore properly denied. Orme v. State, 677 So.2d 258, 262 (Fla.1996). Any question as to whether the evidence was sufficient to overcome all hypotheses of innocence was for the jury to decide. Washington v. State, 653 So.2d 362, 366 (Fla.1994). We hold that there was competent, substantial evidence to support the jury's guilty verdict for sexual battery.

Premeditated Murder Charge
We also hold that the trial court properly denied the motion for judgment of acquittal as to the premeditated murder charge. Premeditation exists when there "is a fully formed conscious purpose to kill." Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986). Premeditation may "be formed in a moment and need only exist `for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" DeAngelo v. State, 616 So.2d 440, 441 (Fla.1993) (quoting Asay v. State, 580 So.2d 610, 612 (Fla. 1991)). Premeditation can be inferred from circumstantial evidence such as "the nature of the weapon used, . . . the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Sochor v. State, 619 So.2d 285, *182 288 (Fla.1993) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)). Moreover, "[t]he deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation." Jimenez v. State, 703 So.2d 437, 440 (Fla.1997), receded from on other grounds by, Delgado v. State, 776 So.2d 233 (Fla.2000).
In this case, the evidence established that Dacosta was stabbed with a Torx screwdriver thirty-six times in the chest and four times in the head. One of the stab wounds to the head penetrated her brain, causing the wound that killed her. She had twelve wounds on her right hand that were consistent with defensive wounds. The State also presented testimony that eyewitnesses had last seen Dacosta alive with Boyd, that her blood was in Boyd's apartment, that Boyd's DNA was on material found under Dacosta's fingernails, and that items at the scene where Dacosta's body was discovered were consistent with items from Boyd's apartment. Under these facts, there was competent, substantial evidence to create an inconsistency with Boyd's theory of innocence and to support the conviction for premeditated murder. See Francis v. State, 808 So.2d 110 (Fla.2001) (twenty-three stab wounds to one victim and sixteen to another supported finding of premeditation as to both victims).
Even if the evidence was insufficient, the State argues that the evidence also supports a first-degree murder conviction on the basis of felony murder. We agree. Since Boyd was also convicted of sexual battery and armed kidnapping, the conviction for first-degree murder would stand even absent sufficient evidence of premeditation. See San Martin v. State, 717 So.2d 462, 470 (Fla.1998) ("[R]eversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient.").

Armed Kidnapping Charge
We hold that the trial court properly denied the motion for judgment of acquittal as to the armed kidnapping charge. Section 787.01(1)(a), Florida Statutes (1997), defines kidnapping as
forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
....
2. Commit or facilitate commission of any felony.
3. Inflict bodily harm upon or to terrorize the victim or another person.
Boyd was charged with armed kidnapping, meaning that during the commission of the kidnapping he possessed, carried, displayed, or used a deadly weapon, under both of these theories of intent.
Eyewitness testimony established that although Dacosta entered Boyd's vehicle voluntarily, she was at the station to get gas and return to her car. Dacosta first approached Bell and Harris, both women, asking only for a ride back to her car. When she accepted a ride from Boyd, who was driving a church van, the jury could have inferred that it was with the sole purpose of receiving a ride back to her car. Although Dacosta had never met Boyd before, her blood was found in his apartment. Boyd's apartment was east of the Texaco station, while Dacosta's car was located only a block west of the stationin the opposite direction. The State relied on this circumstantial evidence, as well as the defensive and other wounds she received from the screwdriver and reciprocating saw, as evidence to establish that Boyd *183 kidnapped Dacosta. The trial court concluded in its sentencing order that "[a]lthough initially Ms. Dacosta voluntarily entered Mr. Boyd's borrowed van, there was some point in time, during the entire episode when Ms. Dacosta was forcibly restrained against her will, as evidenced by the defensive wounds she suffered and the bite marks Mr. Boyd inflicted on her body prior to her death." Sentencing Order at 3. We agree.
This issue raises concerns similar to those in Conahan v. State, 844 So.2d 629, 636-37 (Fla.2003). In Conahan, the victim initially went freely with the defendant after the defendant offered him money to pose for nude photographs. The defendant was convicted of premeditated murder and kidnapping after the victim was discovered dead and bound to a tree at the site of the photo shoot. We held that there was competent, substantial evidence to support the kidnapping charge because even though the victim initially went freely with the defendant and even might have also initially consented to being tied up, the victim's extensive ligature wounds indicated that "the victim was confined against his will at some point and apparently struggled for his life." Id. at 637.
Also instructive is this Court's opinion in Gore v. State, 599 So.2d 978 (Fla.1992). In that case, we affirmed the trial court's denial of a motion for judgment of acquittal on a kidnapping charge, even though the victim, whose body was found in Florida, had initially gone willingly with the defendant when they left a party together in Cleveland, Tennessee. Id. at 985. We concluded that the evidence was sufficient to deny the motion because it showed that the victim had planned to return home at some point on the night she was with the defendant and because a shoestring found tied around her wrist indicated that she had been held against her will. Id.; see also Schwab v. State, 636 So.2d 3, 6 (Fla. 1994) (after victim's nude body was found in a footlocker in a remote location, and evidence revealed that victim died from manual asphyxiation, we concluded that "[a]lthough the victim may have gone willingly with Schwab initially, the conclusion that at some point he was held against his will is inescapable"); Peede v. State, 474 So.2d 808 (Fla.1985) (motion for judgment of acquittal on kidnapping charge properly denied where evidence indicated that although victim went willingly with defendant, she had no intention of leaving Miami or Florida, and her body was recovered in Georgia); cf. Anderson v. State, 841 So.2d 390 (Fla.2003) (evidence insufficient to prove kidnapping because victim went willingly with defendant, and no evidence indicated that she ever tried to escape), cert. denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003).
While no evidence existed of any binding of the victim, as it did in Conahan and Gore, the defensive wounds on Dacosta do indicate that at some point she was in a struggle for her life and was held against her will. As in Gore, Dacosta's family had expected Dacosta to return home immediately following her prayer meeting, and all of Dacosta's actions at the gas station were consistent with this intention. Eyewitness testimony and the evidence of Dacosta's blood at Boyd's apartment suffice to dispute Boyd's theory of innocence that he had never met Dacosta. Thus, there is also competent, substantial evidence sufficient for the jury to conclude that Dacosta was confined at some point against her will under either of the statutory theories of intent and that Boyd used a deadly weapon during the kidnapping.
Boyd also argues that any confinement that did take place was incidental to the other felonies charged. We have held that to find kidnapping under the *184 theory of intent in section 787.01(1)(a)(2), the resulting movement or confinement:
(a) Must not be slight, inconsequential and merely incidental to the other crime;
(b) Must not be of the kind inherent in the nature of the other crime; and
(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.
Faison v. State, 426 So.2d 963, 965 (Fla. 1983) (quoting State v. Buggs, 219 Kan. 203, 547 P.2d 720, 731 (1976)). Competent, substantial evidence supports the State's contention that Boyd's movement and confinement of Dacosta from the Texaco station away from her car made the sexual battery and murder of Dacosta substantially easier to commit and lessened the risk of the crimes being detected while they were being perpetrated.
Boyd was also charged with kidnapping under section 787.01(1)(a)(3) of the kidnapping statute. This subsection requires that the kidnapper have the intent to "[i]nflict bodily harm upon or to terrorize the victim or another person." Competent, substantial evidence supports the finding that Boyd had the intent to harm or terrorize Dacosta while confining her after she voluntarily entered the van. Thus, even if Dacosta's kidnapping did not meet the requirements of Faison, Boyd would still be guilty of kidnapping under section (1)(a)(3) of the statute.

ISSUE 4. IMPROPER ADMISSION OF EVIDENCE
Next, Boyd argues that the trial court erred in admitting evidence that Boyd had failed to pay a train fare and in allowing the State to use the citation in its cross-examination of Boyd. The citation was dated two days before Dacosta's disappearance, and it had Boyd's name and address on it. The trial court admitted the citation into evidence over a defense objection after the State argued that the defense, in its opening statement, had put into question Boyd's residence at the time of Dacosta's disappearance. The pertinent portion of the opening statement was:
But remember what the [State's] opening statement was. We did this, did that, did the other thing. On April the 1st, on April the 1st, 1999, we got this evidence. We got this evidence. We have a search warrant for Lucious' apartment where the evidence is going to show you he didn't live. The evidence is going to show that Geneva Lewis lived there. A long-time girlfriend of Lucious and that she was evicted from that apartment by BSO who showed up with a search warrant and threw she and the kids out for two days while unfettered, unsupervised, and unobserved they did what they wanted in that apartment.
Boyd argues that this statement only addressed the fact that he did not live in the apartment in question on the date of the search, April 1, and that he never contested living in the apartment in December 1998, when Dacosta was murdered. The trial judge "overrule[d] the defendant's objection as to relevancy based on the location issue that the parties have raised."
"[A]ny fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion." Bryan v. State, 533 So.2d 744, 746 (Fla.1988) (quoting Williams v. State, 110 So.2d 654, 658 (Fla.1959)). This Court will not overrule a judge's ruling on the relevancy of evidence unless it finds an abuse of discretion. Heath v. State, 648 So.2d 660, 664 (Fla. 1994). While the opening statement might have only been referring to the fact that Boyd did not live at the apartment on the day of the search, it was not an abuse of *185 discretion for the trial court to admit the citation into evidence under these circumstances.
Even if the admission of this citation was an abuse of discretion, it would not warrant a new trial because any error was harmless. Boyd claims that the citation, since it relates to his honesty, casts doubt on his credibility. Given the substantial amount of DNA evidence against Boyd, as well as eyewitness testimony indicating that he was the last person seen with Dacosta, we hold that any error caused by admitting the citation is harmless. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986) (error is harmless when there is no reasonable possibility that the error contributed to the verdict).

ISSUE 5. CROSS-EXAMINATION OF DEFENDANT
In his fifth claim, Boyd argues that the trial court erred in overruling the defense's objections to the State's cross-examination of Boyd. On direct examination, Boyd denied raping, kidnapping, and murdering Dacosta and stated that he was on trial because the Broward County Sheriff's Office was "going to get [him]." Boyd alleged that during his interrogation by the police, Detective Bukata called him a racial slur and then said, "[W]e told you we was going to get you." In its cross-examination of Boyd, the State proceeded to question him as to the work he performed at his family's funeral home business. The trial court overruled the defense objection to this cross-examination being outside the scope of direct examination but asked the State to limit its cross-examination to more immediate matters. Defense counsel put forth an ongoing objection as to all of the matters discussed on cross-examination, which covered areas including Boyd's relationship with Geneva Lewis, his work for Reverend Lloyd, the locations of various points in the community relevant to the crimes, the fliers about Dacosta's disappearance, the bed purchased by Lewis that was no longer in the apartment, blood that was found in the apartment, items that were in Reverend Lloyd's van the weekend of the murders, the sheets wrapped around Dacosta's body, Boyd's whereabouts on the night of the murders, whether he knew Dacosta, his interrogation by the Broward County Sheriff's Office, and the DNA evidence associated with the crimes.
Section 90.612(2), Florida Statutes (2001), states, "Cross-examination of a witness is limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in its discretion, permit inquiry into additional matters." The permissible bounds of cross-examination are defined as follows:
[W]hen the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts ... or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated, cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief....
Coco v. State, 62 So.2d 892, 895 (Fla.1953) (quoting 58 Am.Jur. Witnesses, § 632, at 352 (1948)). We review trial court decisions as to the scope of cross-examination on an abuse of discretion standard. McCoy v. State, 853 So.2d 396, 406 (Fla. 2003).
*186 This Court, in considering an objection to the scope of cross-examination, stated that a defendant "opened the door to be examined or impeached with evidence that linked him to the murder" when he denied the crime charged. Geralds v. State, 674 So.2d 96, 100 (Fla.1996). Thus, we hold that it was not an abuse of discretion for the trial court to permit the cross-examination to cover a variety of subjects relating to the murder and the evidence linking Boyd to the murder. These matters related to the impeachment of the defendant, and it was not an abuse of discretion for the trial court to allow this cross-examination.
Furthermore, any error that was committed was harmless error. The State did not question Boyd on any relevant matter that was not already in evidence, and therefore there is no reasonable possibility that the error contributed to Boyd's conviction. See Chandler v. State, 702 So.2d 186, 197 (Fla.1997) (defendant could be cross-examined on variety of matters after denying he killed victims, and any error that had occurred was harmless).

ISSUE 6. COMPETENCY EVALUATION
Boyd next argues that the trial court erred in its failure to consider reports and take testimony from doctors who found Boyd incompetent. In October 2000, prior to trial, defense counsel requested a competency hearing because Boyd indicated he wished to waive penalty phase proceedings if the jury found him guilty. Three psychiatrists examined Boyd. Dr. Shapiro, retained by the defense, found that Boyd was not competent to waive penalty proceedings, for although "he was aware of the charges against him and of their seriousness," he was "delusional" as he believed that God had spoken to him and told him that the jury would find him not guilty. Dr. Haber, appointed by the trial court, found Boyd competent, because he understood the charges against him, the possible penalties, and the adversary system and could assist his attorney in the case. Dr. Block-Garfield, also appointed by the trial court, found Boyd incompetent to stand trial, because he was not willing to entertain the possibility of being found guilty and appeared to be "giving lip service" to the doctor's questions so that she would find him competent.
At the hearing on March 26, 2001, Boyd called only Dr. Haber, who testified, consistent with his report, that Boyd was competent. The trial judge noted that he also had Dr. Block-Garfield's report, that he had read it, though it was not in evidence, and that it troubled him because it conflicted with Dr. Haber's testimony. Defense counsel responded that "it was not by whim or speculation" that Boyd had elected not to present the other two doctors. He remarked that there had been cultural differences between Boyd and Dr. Shapiro, such that Dr. Shapiro's report was not reliable. Nor was Dr. Block-Garfield's report reliable, as she had used Shapiro's report in her conclusions. Defense counsel and the defendant wanted a finding of competency, so they did not present testimony from these doctors or enter their reports into evidence. Based on the evidence presented, the trial court concluded that Boyd was competent.
"In determining whether a defendant is competent to stand trial, the trial court must decide whether the defendant `has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding  and whether he has a rational as well as a factual understanding of the proceedings against him.'" Hardy v. State, 716 So.2d 761, 763 (Fla.1998) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. *187 788, 4 L.Ed.2d 824 (1960)). Trial courts are to order competency hearings whenever it appears necessary based on the defendant's history or behavior in court. Gibson v. State, 474 So.2d 1183, 1184 (Fla. 1985). The trial court's function in making this determination is to resolve factual disputes arising from different expert opinions. The competency determination must be based on all relative evidence, and the decision will stand absent an abuse of discretion. Carter v. State, 576 So.2d 1291, 1292 (Fla.1989). When the evidence supports the decision, we have held that the trial court did not abuse its discretion. Mora v. State, 814 So.2d 322, 328 (Fla. 2002).
While Boyd recognizes that the trial court did conduct a competency hearing, he contends that this hearing did not satisfy constitutional requirements because the judge did not consider the reports of Drs. Shapiro and Block-Garfield. However, Boyd's claim is barred, since at trial he asked that the trial court not call these witnesses or consider their reports. Boyd argues that the trial court had the responsibility to call the witnesses when his defense counsel did not. Either the court or a party may call the experts preparing the reports as witnesses. Fla. R.Crim. P. 3.212(a). However, the only impetus placed on a trial judge is to conduct a hearing when events indicate that the defendant is incompetent or upon a motion to do so, and to consider all of the evidence presented. Carter, 576 So.2d at 1292. When the defendant refuses to present evidence, he cannot later argue that the trial court erred in not considering the evidence.
The trial court, the State, and defense counsel all agreed that Boyd understood the proceedings against him and had reason to believe that he would not be found guilty, thus having no need for a penalty phase, because he had previously been acquitted of similar charges in other cases.[5] Thus, there was evidence in the record supporting the finding that Boyd was competent. See Mora, 814 So.2d at 328.

ISSUE 7. COMPETENCY HEARING FOLLOWING GUILT PHASE
Boyd asserts that the trial court erred in not ordering a competency hearing at sentencing. At the start of penalty proceedings, defense counsel requested a withdrawal because Boyd still refused to present any mitigation.[6] Defense counsel indicated that the trial court needed to address Dr. Shapiro's continuing serious concerns about Boyd.
Once a defendant is determined competent to stand trial, a presumption of competence attaches to the defendant in later proceedings. Durocher v. Singletary, 623 So.2d 482, 484 (Fla.1993). However, another competency hearing is required if a bona fide question as to the defendant's competency has been raised. Hunter v. State, 660 So.2d 244, 248 (Fla. 1995). We will affirm the trial court's decision absent an abuse of discretion. Id.
We hold that the trial court did not err in refusing to order a second competency hearing. The record reflects that *188 the trial judge interviewed Boyd on the issue of what mitigation was to be presented and determined that he understood the potential consequences of his decision, that his decision was deliberate, and that he made the decision freely and voluntarily. The record reflects no new evidence that should have raised a bona fide question as to Boyd's mental capacity sufficient to require another hearing, nor did defense counsel specifically ask for a competency hearing. See Hall v. State, 742 So.2d 225, 230 (Fla.1999) (trial judge had no obligation to order competency hearing or make determination of competency when defendant did not request a hearing, and there was no reason to believe defendant's mental capacity had changed at 1990 resentencing since he had been found competent at 1978 trial).

ISSUE 8. WAIVER OF MITIGATION
Boyd claims that the trial court did not comply with the requirements of Koon in accepting his waiver of mitigation. In Koon, the defendant ordered his penalty phase counsel not to present any testimony or evidence. 619 So.2d at 249. While counsel followed Koon's wishes, he still presented an argument for mitigation based upon testimony presented during the guilt phase. Id. at 250. This Court emphasized that it has "repeatedly recognized the right of a competent defendant to waive presentation of mitigating evidence." Id. at 249. However, we also held that when a defendant waives presentation of mitigation against his attorney's wishes, the trial court must be informed of this decision, the attorney must indicate on the record whether there is mitigating evidence that could be presented and what that evidence would be, and the defendant must confirm that he has discussed these matters with his attorney and that despite his attorney's recommendation, he still wishes to waive mitigation. Id. at 250. This ensures that a defendant knowingly and intelligently makes a waiver of mitigation. Chandler v. State, 702 So.2d 186, 200 (Fla.1997). Thus, the record should "reflect a defendant's knowing waiver of his or her right to present mitigating evidence." Mora v. State, 814 So.2d 322, 332-33 (Fla.2002).
We hold that this case is distinguishable from Koon because Boyd did not ultimately waive his right to present mitigation. After discussing matters with his friends and family, Boyd elected to testify during the penalty phase and allowed his pastor to testify. Thus, the requirements of Koon are not applicable in this case because Boyd presented mitigating evidence.
Moreover, the record reflects that the trial judge inquired about the mitigation issue several times and concluded that the mitigation presented was all Boyd wished to present. He stated that Boyd was "making the decision freely and voluntarily with the assistance of able counsel." Additionally, several times defense counsel commented that it had mitigation witnesses to testify on behalf of Boyd, including his mother and brother. Thus, the trial court was aware of the potential mitigation evidence available for Boyd. The record also reflects that the trial court was wholly aware of and was seeking to act in compliance with this Court's decision in Mora. Accordingly, we hold that the trial court did not err. See Waterhouse v. State, 792 So.2d 1176, 1184 (Fla.2001) (Koon requirements were met when defendant made it "abundantly clear" that he was waiving mitigation); Chandler, 702 So.2d at 200 n. 19 (as long as it was demonstrated that waiver was made knowingly, intelligently, and voluntarily, defense counsel was not required to go into explicit *189 detail about what the favorable mitigation evidence would be).

ISSUE 9. WEIGHT GIVEN TO JURY'S PENALTY RECOMMENDATION
Boyd next asserts that the trial court erred in giving great weight to the jury's recommendation of the death sentence. Boyd bases this argument on our opinion in Muhammad, where we held that the trial court erred in giving great weight to a jury's recommendation of the death penalty "when that jury did not hear any evidence in mitigation." 782 So.2d at 363. As stated in our discussion of Issue 8, Boyd did not waive all mitigation but only limited the matters presented on mitigation. Thus, we hold that Muhammad is inapplicable to this case.

ISSUE 10. CONTROL OF PRESENTATION OF MITIGATION
Next, Boyd argues that the defendant's waiver of mitigation was invalid because it is the attorney's obligation to decide what evidence is to be presented in the penalty phase of trial. We review decisions of the trial court in its handling of mitigation issues for abuse of discretion. Spann v. State, 857 So.2d 845, 854 (Fla. 2003). Boyd attempts to distinguish a long line of cases holding that a pro se defendant may waive the presentation of mitigating evidence because Boyd was represented by counsel and his counsel should have controlled the presentation of mitigating evidence. This argument is without merit.
As stated above, we have long recognized that a competent defendant may waive the right to present all mitigating evidence. Hamblen v. State, 527 So.2d 800 (Fla.1988). This right is not altered when the defendant has counsel. Again, Boyd did not waive his right to present mitigating evidence. Instead, he limited the presentation of such evidence to his testimony and that of his pastor. Boyd argues that the trial court erred in failing to comply with Koon (discussed above under Issue 8) and Mora v. State, 814 So.2d 322 (Fla. 2002), in accepting Boyd's presentation of mitigating evidence.
In Mora, the defendant objected to penalty phase counsel contacting his relatives that lived overseas as part of counsel's investigation of mitigating evidence. The trial court relied on Koon in refusing to allow the defendant to waive any mitigating evidence before counsel had investigated all such evidence. Id. at 331. The defendant refused to allow counsel to contact his family and proceeded pro se during the penalty phase, where he presented no mitigating evidence. Id. at 332. We reversed the death sentence because the trial court misapplied Koon in holding that it barred a defendant from waiving mitigation before counsel first investigates all possible mitigation. Id. Instead, Koon simply developed a procedure so that the record clearly reflects "a defendant's knowing waiver of his or her right to present mitigating evidence." Id. at 332-33. The defendant received a new penalty phase, because the record reflected that he had only wished to waive a portion of the mitigating evidence and had done so knowingly, intelligently, and voluntarily.
Thus, a defendant possesses great control over the objectives and content of his mitigation. See Farr v. State, 656 So.2d 448, 449 (Fla.1995) (no error when defendant takes stand to refute and disclaim any possible mitigation because defendant is entitled to control overall objectives of counsel's argument). Whether a defendant is represented by counsel or is proceeding pro se, the defendant has the right to choose what evidence, if any, the defense will present during the penalty *190 phase. See Grim v. State, 841 So.2d 455, 461 (Fla.), cert. denied, 540 U.S. 892, 124 S.Ct. 230, 157 L.Ed.2d 166 (2003).
The record provides extensive support to substantiate that Boyd understood his rights and understood the consequences of his choice to present only the testimony of his pastor and himself. Boyd was exercising his right to be the "captain of the ship" in determining what would be presented during the penalty phase. See Nixon v. Singletary, 758 So.2d 618, 625 (Fla.2000). Therefore, we hold that the trial court correctly allowed Boyd to make a knowing and voluntary decision as to what testimony was to be presented in mitigation.
Boyd attempts to analogize the instant case to that of Klokoc v. State, 589 So.2d 219 (Fla.1991), where this Court held that a defendant cannot prevent his counsel from challenging a sentence on appeal. However, this analogy confuses the distinction between a defendant's rights during a trial versus his rights on appeal. The differences between the trial and appellate levels were succinctly defined in Ocha v. State, 826 So.2d 956, 964 (Fla. 2002):
Thus, Klokoc reiterates this Court's interest in ensuring that every death sentence is tested and has a proper basis in Florida law.
This proposition is not ... inconsistent with our Hamblen opinion. Hamblen and its progeny operate under the premise that a competent defendant may direct his own defense at trial. See Farr v. State, 656 So.2d 448, 449 (Fla. 1995). However, on appeal, this Court must examine [a defendants] death sentence to ensure the uniform application of law, evidentiary support, and proportionality. See Alston, 723 So.2d at 160. To facilitate the Court's duty, Klokoc requires that the defendant have appellate counsel. Therefore, it is not inconsistent for [a defendant] to waive his right to present mitigating evidence at the trial level, yet have appellate counsel appointed against his wishes.
Therefore, a lawyer is fully within the confines of his professional duties in honoring a knowing, intelligent, and voluntary waiver to present mitigation during the penalty phase.

ISSUE 11. HAC AND FELONY MURDER AGGRAVATORS
Boyd argues that the evidence does not support the HAC aggravator. The sentencing order states that the trial court found beyond a reasonable doubt that the manner of Dacosta's death indicated "a complete disregard for the suffering of another human being":
The evidence at trial indicated that Mr. Boyd stabbed Ms. Dacosta in the chest 36 times with an instrument consistent with the design of a torque screwdriver. The injuries to Ms. Dacosta's chest consisted of superficial puncture wounds, which did not penetrate her sternum. The injuries to the chest occurred in a pattern, indicating that Mr. Boyd inflicted the wounds at the same time.
While Mr. Boyd repeatedly stabbed Ms. Dacosta, she was conscious and struggled against her assailant, as reflected by the defensive wounds about her hands and arms.... These wounds were in addition to the bite marks evident on her hands.
. . . .
... The evidence indicates that Ms. Dacosta was aware of her impending death, as she fought against Mr. Boyd, through the pain, fear, and suffering that Mr. Boyd inflicted with each of the *191 36 blows to her chest, and up until the fatal blow to her brain.
Sentencing Order at 2-3.
In reviewing a trial court's finding of an aggravating factor, we review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding. Willacy v. State, 696 So.2d 693, 695 (Fla.1997). "For HAC to apply, the crime must be conscienceless or pitiless and unnecessarily torturous to the victim." Davis v. State, 859 So.2d 465, 478 (Fla.2003). We hold that the trial court here did not err in finding HAC as an aggravating factor against Boyd.
We have consistently affirmed the HAC aggravator where the victim was repeatedly stabbed and remained conscious during part of the attack. Id. Boyd argues that the evidence did not prove that Dacosta was alive or conscious while being stabbed. However, Dr. Joshua Perper, the Chief Medical Examiner for Broward County, testified that the bruising around the wounds on Dacosta's chest, hands, and arms indicated she was alive when the wounds were inflicted. Dr. Perper also testified that Dacosta could not have raised her arm, and thus could not have sustained the defensive wounds she received, if she had been unconscious. While the exact order of wounds could not be established, there was competent, substantial evidence to support the trial court's finding that Dacosta was alive and conscious for some of the attack, and was struggling with her attacker.
Boyd also argues that the trial court erred in applying the aggravator that the murder was committed in the course of committing another felony because there was insufficient evidence to support his convictions for sexual battery and armed kidnapping. As discussed above, we hold that there was sufficient evidence to support the sexual battery and armed kidnapping convictions, and thus the trial court did not err in finding the aggravator that the murder was committed in the course of a felony.
Boyd argues that should we agree with him that the trial court erred in finding either of the above aggravators, we should reverse his sentence because a death sentence cannot stand when it is based on only one aggravator. Since we affirm the trial court's finding of both aggravators, we need not consider whether a death sentence is proper when only one aggravator is found. However, we note that this Court has affirmed sentences where there was only one aggravator and little mitigation evidence. See Butler v. State, 842 So.2d 817, 833 (Fla.2003).

ISSUE 12. AUTOPSY PHOTOS
Boyd next asserts that the trial court erred in admitting autopsy photographs of the victim during the penalty phase of trial. The photographs challenged were: (1) Exhibit 2, which showed Dacosta's right forearm and the defensive wounds inflicted by the screwdriver; (2) Exhibit 5, which showed the thirty-six stab wounds on her chest; (3) Exhibit 6, which was a close-up of the stab wounds; and (4) Exhibit 7, which showed the fatal head wound. The trial court admitted the photographs because they were relevant in the penalty phase to the HAC factor and supplemented the medical examiner's testimony.
We will not disturb a trial court's ruling on the admissibility of a photograph absent a clear abuse of discretion. Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). Photographic evidence is admissible if it is relevant to a material fact in dispute. Thus, "autopsy photographs, *192 even when difficult to view, are admissible to the extent that they fairly and accurately establish a material fact and are not unduly prejudicial." Rose v. State, 787 So.2d 786, 794 (Fla.2001). This Court has upheld the admission of photos to demonstrate the HAC factor during the penalty phase. See id. at 795; Mansfield, 758 So.2d at 648. This Court has also repeatedly upheld the admission of photographs when they are necessary to explain a medical examiners testimony, the manner of death, or the location of the wounds. See, e.g., Davis v. State, 859 So.2d 465, 477 (Fla.2003); Floyd v. State, 808 So.2d 175, 184 (Fla.2002); Pope v. State, 679 So.2d 710, 713-14 (Fla.1996).
Exhibits 2, 5, and 6 were properly admitted. None of these exhibits were unduly prejudicial, and thus the trial court did not err in admitting them. The admissibility of Exhibit 7 (showing the fatal head wound, as well as the top portion of the victim's body) is a closer call. The photograph is somewhat gruesome, because decomposition of the body had begun, resulting in the victim's eyes bulging significantly. Also, fragments of the brain are visible. However, we have affirmed the admissibility of even gruesome photographs when they are "independently relevant or corroborative of other evidence." Czubak v. State, 570 So.2d 925, 928 (Fla. 1990). Because this photograph was the only depiction of the manner of death, assisted the medical examiner in his testimony, and was relevant to the HAC aggravating factor, we hold that the trial court did not err in admitting the photo. See Harris v. State, 843 So.2d 856, 865 (Fla. 2003) (admission of crime scene photographs of the decomposed body of the victim were relevant, since they demonstrated the manner of death and assisted officer in testimony at trial about the crime scene). The trial judge carefully considered the relevance of each photo before admitting it and even sustained objections to another photograph in order to ensure that the evidence was not repetitious. See Floyd v. State, 808 So.2d 175, 184 (Fla.2002).

ISSUE 13. MITIGATING CIRCUMSTANCES
Boyd claims that the trial court erred in its assessment of mitigating circumstances. The trial court found and gave weight to one statutory and five nonstatutory mitigators. The trial court accorded minimal weight to the nonstatutory mitigating circumstances. The relevant parts of the sentencing order challenged under this claim stated:
1) The Defendant is religious.
Pastor Lester E. Matthews, Mr. Boyd's prison minister, . . . testified that while in the county jail, Mr. Boyd has been a model Christian, exhibiting forgiveness to those who have wronged him, and sharing his beliefs with other prisoners.
This Court finds that Mr. Boyd's religious beliefs, however, did not prevent him from brutally assaulting, raping, and murdering Dawnia Dacosta. The forgiveness professed by Mr. Boyd is directed towards members of the Broward Sheriff's Office and the Office of the State Attorney, as Mr. Boyd believes that he was framed by these agencies.
The mitigator involving religion has been proven by a preponderance of the evidence. The Court gives it minimal weight.
. . . .
4) Lucious Boyd came from a good family.
Pastor Williams testified that Mr. Boyd came from a good family, and that he was raised by his parents with love and with the highest standards of integrity. *193 Nevertheless, this Court finds that the positive influence of Mr. Boyd's loving family background did not prevent him from committing the brutal murder of Dawnia Dacosta, who also came from a good family; and, it is therefore especially tragic that, because of Mr. Boyd's actions, two good, loving families are made to suffer.
This factor has been proven by a preponderance of the evidence. The Court gives it minimal weight.
Sentencing Order at 6-8. Boyd argues that the trial court's rationale for according minimal weight to these mitigating circumstances was in error because this Court has held that the trial court should not rely on the jury's verdict to reject proposed mitigating factors. Morgan v. State, 639 So.2d 6, 13 (Fla.1994). However, we do not read the trial court's order to state that the judge relied upon the verdict to reject these mitigating factors. The order states that the mitigation was proven but gives minimal weight to this mitigation. Boyd also argues that the trial court's reasoning is also illogical, since it could be used to accord less weight to mitigating factors in every murder trial.
However, trial courts have the sound discretion to determine what weight, if any, to accord to mitigating factors. Stephens v. State, 787 So.2d 747, 761 (Fla. 2001). This Court sustains a trial court's assessment of the weight given to a mitigating factor absent an abuse of discretion and when the evidence supports the conclusions. Anderson v. State, 863 So.2d 169, 178 (Fla.2003), cert. denied, 541 U.S. 940, 124 S.Ct. 1662, 158 L.Ed.2d 363 (2004). Because trial courts are in the best position to observe the unique circumstances of a case, they have broad discretion in their decisions as to how much weight to assign to a particular mitigator. See Foster v. State, 679 So.2d 747, 755 (Fla.1996) ("As long as the court considered all of the evidence, the trial judge's determination of lack of mitigation will stand absent a palpable abuse of discretion."). Though deference is given to trial courts in this weighing of mitigation, we do point out the existence of mitigation evidence is not to be determined on the basis of whether the mitigating factor prevented the crime.
Moreover, in this case any error committed by the trial court in this part of the sentencing order was harmless error beyond a reasonable doubt. The trial court was presented very little evidence in mitigation and found there to be two weighty aggravators which we have found to be supported by competent, substantial evidence.

ISSUE 14. PROPORTIONALITY OF DEATH SENTENCE
Boyd next asserts that his death sentence was not proportionate. To determine whether death is a proportionate penalty, we consider the totality of the circumstances of the case and compare the case with other capital cases where a death sentence was imposed. Pearce v. State, 880 So.2d 561, 577 (Fla.2004).
Considering the totality of the circumstances surrounding this case, the aggravating and mitigating circumstances, and other similar cases, the death sentence imposed upon Boyd is proportional. See, e.g., Mansfield v. State, 758 So.2d 636, 647 (Fla.2000) (death sentence was proportionate where trial court found two aggravating factors, HAC and murder committed during sexual battery, measured against five nonstatutory factors that were given little weight); Davis v. State, 703 So.2d 1055, 1061-62 (Fla.1997) (death sentence was proportionate where trial court found two aggravating factors of HAC and committed during course of sexual battery outweighed *194 slight nonstatutory mitigation); Geralds v. State, 674 So.2d 96 (Fla.1996) (death sentence was proportionate where trial court found two aggravating circumstances, HAC and murder in course of felony, and some nonstatutory mitigation).

ISSUE 15. TRIAL COURT'S COMPLIANCE WITH MUHAMMAD V. STATE

Finally, Boyd argues that the trial court erred in assigning great weight to the jury's death recommendation because of this Court's holding in Muhammad v. State, 782 So.2d 343 (Fla.2001). In Muhammad, we set out procedures to apply when "the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence," including the preparation of a PSI or permitting the defendant to address the jury. Id. at 363. As explained in the analysis under Issue 8, Boyd did not waive all mitigation. Thus, we hold that the trial court did not err in its sentencing of Boyd.

CONCLUSION
Accordingly, we affirm Boyd's convictions and sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The aggravating factors were that the crime (1) was especially heinous, atrocious, or cruel (HAC) (accorded great weight), and (2) was committed while the defendant was committing or attempting to commit kidnapping and sexual battery (accorded moderate weight).
[2] The statutory mitigating factor was that the defendant had no significant prior criminal history, to which the court accorded medium weight.
[3] The nonstatutory mitigating factors were all accorded minimum weight and were that the defendant (1) is religious, (2) has a good jail record, (3) has family and friends who care for and love him, (4) came from a good family, and (5) expressed remorse for the victim and her family.
[4] Boyd claims that (1) the trial court erred in refusing to make an inquiry of jurors and in denying a mistrial upon hearing testimony that jurors had discussed extrajudicial information; (2) the trial court erred in overruling the defense's request for material withheld in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), denying the defense's motion to strike the testimony of the fingerprint examiner, and not ordering a hearing in compliance with Richardson v. State, 246 So.2d 771 (Fla.1971); (3) the State's evidence was insufficient to support the convictions for sexual battery, first-degree murder, and armed kidnapping; (4) the trial court erred in overruling the defense's objection to evidence that Boyd had received a citation for failure to pay a train fare, and in overruling the defense's objection to the use of the citation in Boyd's cross-examination; (5) the trial court erred in overruling the objections to the State's cross-examination of Boyd; (6) the trial court erred in failing to consider two experts' reports and testimony as to Boyd's competency; (7) the trial court erred in not ordering a competency hearing at sentencing; (8) Boyd's waiver of mitigation did not comply with Koon v. Dugger, 619 So.2d 246 (Fla.1993); (9) the trial court erred in giving great weight to the jury's death penalty recommendation; (10) Boyd's presentation of mitigation was invalid because the decision of whether to call witnesses and present evidence is for counsel to make; (11) the evidence does not support the HAC and murder in the course of a felony aggravating factors, and section 921.141, Florida Statutes (1997), does not allow a death sentence when there is only one aggravating circumstance; (12) the trial court erred in overruling the objection to the introduction of photographs of the victim during penalty proceedings; (13) the trial court erred in its assessment of mitigating circumstances; (14) Boyd's death sentence is not proportionate; and (15) the trial court failed to comply with Muhammad v. State, 782 So.2d 343 (Fla.2001), in sentencing Boyd.
[5] Boyd's Presentence Investigation Report (PSI) reveals numerous drug and driving related charges against Boyd. Also reflected in the report are his acquittals of second-degree murder in 1993, armed kidnapping and armed sexual battery in 1998, and sexual battery in 1999.
[6] After the State's presentation during penalty proceedings and after discussing matters with his family and friends, Boyd did eventually elect to present mitigation and allowed testimony from his pastor, and then Boyd read his own statement to the jury.